ESTATE OF BERNARD H. STAUFFER, BONNIE H. STAUFFER, EXECUTRIX, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4561–63—4563–63.   Filed June 14, 1967.

*Norman B. Barker* and *Arthur O. Armstrong, Jr.*, for the petitioners. *Edward M. Fox*, for the respondent.

292

¹ 732 of these units were manufactured during period from Feb. 1, 1960, to Jan. 31, 1961.

OPINION

RAUM, *Judge:* 1. (*F*) *Reorganization Issue.*—Each of the three old Stauffer companies (California, Illinois, and New York), the taxpayers herein, had a fiscal year ending January 31. On October 1, 1959, all three were absorbed by Stauffer New Mexico pursuant to the statutory merger laws of California, Illinois, New York, and New Mexico, and their separate existence ceased on that day. The two principal questions before us are (a) whether the taxable year of each of the old companies was required to end at the time of the merger, with the consequence that each was obliged to file a closing return for the period February 1–September 30, 1959, and (b) whether a net operating loss sustained by the new company for its fiscal year ending January 31, 1961, could be carried back and applied against the income of Stauffer California for its fiscal years ending January 31, 1958 and 1959.[3]

The mere fact that there has been a tax-free reorganization is not sufficient to relieve the old companies of their obligation to file closing returns, nor does it authorize the carryback in question. Indeed, section

---

[3] Other issues presented will be considered hereinafter.

381(b) (1) and (3) [4] make it abundantly clear that unless the reorganization is one that qualifies under subparagraph (F) of section 368(a)(1),[5] the two principal issues must be decided against the petitioner. So much is not in dispute, and the matter turns entirely upon whether there was an (F) reorganization.

An (F) reorganization is one of six types of transaction (subparagraphs (A) through (F)) that are included within the meaning of the term "reorganization" as it is defined in section 368(a)(1)—all of which may result in tax-free transfers or exchanges. However, an (F) reorganization is strictly limited to "a mere change in identity, form, or place of organization, however effected."

---

[4] SEC. 381. CARRYOVERS IN CERTAIN CORPORATE ACQUISITIONS.

(a) GENERAL RULE.—In the case of the acquisition of assets of a corporation by another corporation—

(1) in a distribution to such other corporation to which section 332 (relating to liquidations of subsidiaries) applies, except in a case in which the basis of the assets distributed is determined under section 334(b)(2) ; or

(2) in a transfer to which section 361 (relating to nonrecognition of gain or loss to corporations) applies, but only if the transfer is in connection with a reorganization described in subparagraph (A), (C), (D)· (but only if the requirements of subparagraphs (A) and (B) of section 354(b)(1) are met), or (F) of section 368(a)(1),

the acquiring corporation shall succeed to and take into account, as of the close of the day of distribution or transfer, the items described in subsection (c) of the distributor or transferor corporation, subject to the conditions and limitations specified in subsections (b) and (c).

(b) OPERATING RULES.—Except in the case of an acquisition in connection with a reorganization described in subparagraph (F) of section 368(a)(1)—

(1) The taxable year of the distributor or transferor corporation shall end on the date of distribution or transfer.

\*　　　\*　　　\*　　　\*　　　\*　　　\*

(3) The corporation acquiring property in a distribution or transfer described in subsection (a) shall not be entitled to carry back a net operating loss for a taxable year ending after the date of distribution or transfer to a taxable year of the distributor or transferor corporation.

[5] SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS.

(a) REORGANIZATION.—

(1) IN GENERAL.—For purposes of parts I and II and this part, the term "reorganization" means—

(A) a statutory merger or consolidation ;

(B) the acquisition by one corporation, in exchange solely for all or a part of its voting stock, of stock of another corporation if, immediately after the acquisition, the acquiring corporation has control of such other corporation (whether or not such acquiring corporation had control immediately before the acquisition) ;

(C) the acquisition by one corporation, in exchange solely for all or a part of its voting stock (or in exchange solely for all or a part of the voting stock of a corporation which is in control of the acquiring corporation), of substantially all of the properties of another corporation, but in determining whether the exchange is solely for stock the assumption by the acquiring corporation of a liability of the other, or the fact that property acquired is subject to a liability, shall be disregarded ;

(D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders (including persons who were shareholders immediately before the transfer), or any combination thereof, is in control of the corporation to which the assets are transferred ; but only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355, or 356 ;

(E) a recapitalization ; or

(F) a mere change in identity, form, or place of organization, however effected.

Before consummating the reorganization in question the parties had sought and obtained from the Internal Revenue Service a ruling to the effect that the transaction would result in a tax-free reorganization as a "statutory merger or consolidation" within the meaning of subparagraph (A) of section 368(a) (1). It was then expected that each of the constituent companies would file closing returns, and indeed, as late as December 15, 1959, an application was filed on behalf of each of the three old Stauffer companies for an extension of time for filing returns for the period February 1–September 30, 1959. Accompanying that request was a payment of $300,000 on behalf of Stauffer California, $200,000 on behalf of Stauffer Illinois, and $7,000 on behalf of Stauffer New York. It was only later, when it became clearly apparent that the new company had sustained substantial losses during the 4-month period, October 1, 1959–January 31, 1960, that it was determined to file a single return for the full fiscal year February 1, 1959–January 31, 1960, in the name of the new company and to include therein the profitable operations of the three old Stauffer companies for the first 8 months against which the losses of the last 4 months were applied. In order to justify that course of action, as well as the failure to file closing returns for the three old Stauffer companies, the position was taken that the merger of the three old companies into Stauffer New Mexico was an (F) reorganization. Of course, if the merger was an (F) reorganization then the course of action taken would have been proper under section 381(b) (1). Similarly, the existence of an (F) reorganization would have removed the prohibition against the carryback of the fiscal 1961 net operating loss to a pre-merger year pursuant to section 381(b) (3). We hold that the merger was not an (F) reorganization.

It must be remembered at the outset that *all* reorganizations, (A) through (F), may result in tax-free exchanges, and that the reason for nonrecognition upon such transfers or exchanges is that the taxpayer's interest upon a corporate distribution or exchange of securities may represent "merely a new form of the previous participation in an enterprise, involving no change of substance in the rights and relations of the interested parties one to another or to the corporate assets." *Bazley* v. *Commissioner*, 331 U.S. 737, 740. In the aggregate, subparagraphs (A) through (F) represent an attempt to set forth comprehensively the various types of transactions that may be regarded as reorganizations and thus qualify for specified tax-free treatment. But the problems generated by reorganizations went far beyond nonrecognition of gain or loss. Since the reorganized corporation was regarded at least to a certain extent as the successor to an enterprise or enterprises previously carried on in different form, it became necessary to provide for continuity of certain aspects of these businesses

from a tax point of view. Thus, section 381 spells out in great detail the extent to which the acquiring corporation in certain reorganizations and other related transactions shall succeed to and take into account various specified items of the distributor or transferor corporation. The general rule for such continuity is contained in section 381(a), footnote 4, *supra*, and a long list of items to which that general rule applies is set forth in section 381(c). That list deals with such items as net operating loss carryovers, earnings and profits, methods of accounting, inventories, methods of computing depreciation allowance, and a variety of other matters, all cataloged in 22 numbered paragraphs each of which is subject to conditions or limitations set forth therein.

However, Congress was unwilling to provide for complete continuity in every reorganization, and section 381(b), which is captioned "Operating Rules," sets forth certain limitations which in general preclude the continuity of certain items. Thus, except in the case of an (F) reorganization, section 381(b)(1) requires that the taxable year of the transferor corporation shall end on the date of transfer, and section 381(b)(3) explicitly deprives the acquiring corporation of the right to carry back a net operating loss for a taxable year after the transfer to a taxable year of the transferor corporation. This is spelled out in somewhat greater detail in section 1.381(b)–1(a) of the Treasury Regulations which provides:

Sec. 1.381(b)–1 Operating rules applicable to carryovers in certain corporate acquisitions.

(a) *Closing of taxable year*—(1) *In General.* Except in the case of a reorganization qualifying under section 368(a)(1)(F), the taxable year of the distributor or transferor corporation shall end with the close of the date of distribution or transfer.

(2) *Reorganizations under section 368(a)(1)(F).* In the case of a reorganization qualifying under section 368(a)(1)(F) (whether or not such reorganization also qualifies under any other provison of section 368(a)(1)), *the acquiring corporation shall be treated* (for purposes of section 381) *just as the transferor corporation would have been treated if there had been no reorganization.* Thus, the taxable year of the transferor corporation shall not end on the date of transfer merely because of the transfer; a net operating loss of the acquiring corporation for any taxable year ending after the date of transfer shall be carried back in accordance with section 172(b) in computing the taxable income of the transferor corporation for a taxable year ending before the date of transfer; and the tax attributes of the transferor corporation enumerated in section 381(c) shall be taken into account by the acquiring corporation as if there had been no reorganization.

[Italic supplied.]

The underlying theory of these provisions quite plainly is that there is such a complete identity between the pre- and post-reorganization enterprises in an (F) reorganization that the acquiring corporation is

to be treated exactly as the transferor corporation would have been treated in the absence of any reorganization. In other words, even though tax-free reorganizations in general are regarded as providing continuity of enterprise and ownership of the business so as to permit the carryover of the various items listed in section 381(c), they nevertheless are not treated as involving sufficient identity in the situations covered by section 381(b), unless the reorganization satisfies the stricter requirements of section 368(a)(1)(F). It is against this background that we must consider the question whether there was an (F) reorganization in this case.

The Government argues that an (F) reorganization is limited to the reorganization of a single corporation and that it does not include the more involved combination of two or more corporations where each has been conducting a separate business. We think that its position is correct, and we reject petitioner's contention that there was an (F) reorganization here because of stockholder identity and the fact that the businesses previously conducted by the three old companies were continued without interruption by the new entity.

The scope of section 368(a)(1)(F) was recently described as follows in *Hyman H. Berghash*, 43 T.C. 743, 752, affirmed 361 F. 2d 257 (C.A. 2):

> Although the exact function and scope of the (F) reorganization in the scheme of tax-deferred transactions described in section 368(a)(1) have never been clearly defined, it is apparent from the language of subparagraph (F) that it is distinguishable from the five preceding types of reorganizations as encompassing only the simplest and least significant of corporate changes. The (F)-type reorganization presumes that the surviving corporation is the same corporation as the predecessor in every respect, except for minor or technical differences. *Ahles Realty Corp* v. *Commissioner*, 71 F. 2d 150, affirming an order of this Court. For instance, the (F) reorganization typically has been understood to comprehend only such insignificant modifications as the reincorporation of the same corporate business with the same assets and the same stockholders surviving under a new charter either in the same [3] or in a different State,[4] the renewal of a corporate charter having a limited life,[5] or the conversion of a U.S.-chartered savings and loan association to a State-chartered institution.[6] [Footnotes omitted.]

In our judgment the merger of the three viable corporations herein into a single new corporate entity involved changes that were far too significant to be dismissed as a "mere" change in identity, form, or place of organization. True, there was a shift in place of organization to New Mexico. But the reorganization entailed much more. Prior to the merger each of the three old Stauffer companies carried on its own separate business, in its own geographical area. While each had the same officers, it is plain from the manner in which the businesses were conducted that each had its own employees within its own territory.

Moreover, only Stauffer California, with its factory in Los Angeles, and Stauffer Illinois in its rented facilities in West Memphis and Little Rock, manufactured Stauffer products. Stauffer New York purchased its needs from the other two and engaged only in selling and leasing activities. There was also an undisclosed amount of buying and selling between Stauffer California and Stauffer Illinois. Moreover, after the merger, a creditor of any of the three could look to the combined assets of the new corporation to satisfy his claim. Important accounting changes also occurred. The respective capital and surplus accounts of the constituent corporations were combined. Yet, if petitioner is correct in the argument that an (F) reorganization is not limited to a single corporation, a deficit in one corporation would offset surplus in another, thus affecting future dividends that might be paid by the new entity under applicable State law. The fact that no such deficit existed here is not important; the point is that this possibility emphasizes the weakness of petitioner's position.

The legislative history of subparagraph (F) throws further light upon the problem. The category of corporate transactions known today as (F) reorganizations has been a part of our tax law since it first appeared in section 202(c)(2) of the Revenue Act of 1921, which defined the term reorganization as including a "mere change in identity, form, or place of organization *of a corporation.*" (Emphasis supplied.) When this definition was reenacted in otherwise identical language in the Revenue Act of 1924, the last three words were dropped. But there was no indication whatever that the deletion was intended to have any significance. To the contrary, the most probable explanation is that the 1924 Act reflected merely a draftsman's preference whereby these words were eliminated as surplusage. Indeed, the House Ways and Means Committee explained the omission of these words and certain other language changes as "minor changes in phraseology." See H. Rept. No. 179, 68th Cong., 1st Sess., p. 13. And in general a type-(F) reorganization has since been regarded as encompassing "only the simplest and least significant of corporate changes" in which one corporation transfers its assets to another which "is *the same corporation* as its predecessor in every respect, except for minor and technical differences." *Hyman H. Berghash*, 43 T.C. 743, 752, affirmed 361 F. 2d 257 (C.A. 2) (emphasis supplied). See also *Ahles Realty Corp.* v. *Commissioner*, 71 F. 2d 150 (C.A. 2), certiorari denied 293 U.S. 611; *George Whittell & Co.*, 34 B.T.A. 1070.[6]

Petitioner has relied upon statements in various cases to the effect that a transaction which shifts the ownership of the proprietary inter-

⁶ In fact, the (F) reorganization has come to be identified with the typical case in which a single corporation reincorporates in a different jurisdiction. Cf. *Marr* v. *United States*, 268 U.S. 536, Paul, Studies in Federal Taxation 82 (Harv. Univ. Press (3d ser.) 1940).

est in a corporation cannot qualify as a mere change in identity, etc., within the meaning of (F). Cf., e.g., *Helvering* v. *Southwest Consolidated Corp.*, 315 U.S. 194, 202–203. From such statements petitioner leaps to the conclusion that since there was no shift in proprietary interest here and since the enterprises conducted by each of the three constituent corporations were continued without change by Stauffer New Mexico it necessarily follows that there was an (F) reorganization in this case. The fallacy in such verbal sleight-of-hand is obvious. Certainly, it is necessary that there be continuity of both proprietary interest and enterprise in order to qualify as an (F) reorganization. But that is not enough, for there may be other changes that are too significant to be ignored in determining whether there was a "mere change in identity, form, or place of organization." And in this case substantial changes did occur when the separate businesses of three separate corporations were united in a new corporation.

Only by disregarding the corporate entities of the three old companies can it be said that there was merely that type of purely formal change that characterizes an (F) reorganization. These corporations were separate entities and were treated as such for all purposes, including the computation of taxes. Indeed, there were three separate surtax exemptions, one for each corporation, whereas the new entity admittedly was entitled to only one such exemption. This is not a case of multiple corporations carrying on a single business which may be ignored as a sham. Cf. *Aldon Homes, Inc.*, 33 T.C. 582. There is no question here that these were valid separate corporations, each conducting its own business. And we think that in such circumstances, the unification of these enterprises under a single corporate roof cannot qualify as the kind of mere change in identity, etc., contemplated by section 368(a)(1)(F).

The Supreme Court's opinion in *Libson Shops, Inc.* v. *Koehler*, 353 U.S. 382, gives further support to the conclusion that the new corporation cannot be regarded the same, except for minor and technical changes, as its collective predecessors. There, as here, separate corporations owned by the same interests and engaged in related businesses, were merged into one corporation which continued to conduct the entire enterprise in the same manner as before the merger. The Court refused to treat the survivor as the same "taxpayer" as its predecessors, and sustained a disallowance, under the 1939 Code, of a carryover of pre-merger losses to the post-merger income of the survivor.[7] One of the cases relied upon by the taxpayer was *Newmarket Manufacturing Co.*

---

[7] It is true that *Libson Shops* involved the 1939 Code and that the provisions relating to carryover of losses have been changed in the 1954 Code, cf. *Maxwell Hardware Co.* v. *Commissioner*, 343 F.2d 713 (C.A. 9) ; but its relevance to the issue before us in respect of the nature of the change effected by combining several active corporations into a single corporation remains unimpaired.

v. *United States*, 233 F.2d 493 (C.A. 1), where a single corporation transferred its business to a corporate shell which the stockholders had set up in another jurisdiction, and a carryover of losses from the predecessor to the post-merger income of the survivor was allowed. The Supreme Court expressly distinguished the *Newmarket* case, which involved the typical (F) reorganization situation of the reincorporation of a single corporation in another jurisdiction, from the multiple corporation merger before it, on the ground that the multiple reincorporation involves combining several businesses which, up until the time of the merger, had been taxed as separate entities. In the words of the Court, "this difference is *not merely a matter of form.*" 353 U.S. 382, 388. (Emphasis supplied.)

There are indications in the 1954 Code that Congress regarded type (F) as including only the reorganization, by reincorporation or otherwise, of a single corporation, devoid of any other corporate or tax significance. Thus, section 1244 provides in general that losses on common stock of a "small business corporation," so-called "section 1244 stock," may be deducted as ordinary losses instead of losses from the sale or exchange of a capital asset. The applicability of these provisions turns upon a highly complex set of conditions, one of which reads as follows:

Section 1244(d)(2): For purposes of paragraphs (1)(E) and (2)(A) of subsection (c), a successor corporation in a reorganization described in section 368 (a)(1)(F) shall be treated as *the same corporation* as *its predecessor*. [Italic supplied.]

The use of the singular words "corporation" and "predecessor" are again evidence that Congress thought of an (F) reorganization in terms of a single corporation. Moreover, if several predecessors can be involved in an (F) reorganization difficult problems would arise as to which predecessor or whether all predecessors taken together may be taken into account in determining whether the complex requirements of subsections (c)(1)(E) and (c)(2)(A) of section 1244 have been satisfied. Unless we follow the obviously intended "one-corporation" reading of the (F) reorganization, we would be faced with a difficult problem for which no solution is provided in the Code or regulations.[8]

---

[8] Petitioner asserts that the regulations have taken this very situation into account. Sec. 1.1244(d)-3(d)(1), Income Tax Regs. These regulations provide that if common stock is received in an (F) reorganization partly in exchange for stock not meeting the requirements of sec. 1244, only that percentage of common stock received which is determined by the ratio of the basis of the nonqualifying shares given up to the basis of all shares given, will be disqualified as sec. 1244 stock. Thus, petitioner claims, not only is sec. 1244 not inconsistent with a multiple reincorporation (F) reorganization, but the regulations have in fact anticipated and provided for this very possibility. But a careful examination of the regulations discloses that such is not the case.

An identical counterpart to this regulation deals with nonqualifying stock given up in an (E) reorganization, a recapitalization, which plainly involves only one corporation. Sec. 1.1244(d)-3(c)(2), Income Tax Regs. What the regulations are dealing with here, in both

Section 381, which is itself involved herein, also reveals obviously unintended pitfalls and difficulties that would be encountered if the (F) definition were read so as to include the fusion of several brother-sister corporations each conducting an independent enterprise. Paragraph (b)(3) explicitly forbids the carryback of a net operating loss to a taxable year of "the distributor or transferor corporation." In this very case, the new corporation sustained a net operating loss for its fiscal year 1961, and it attempted to carry back that loss to fiscal 1958 and 1959 *of only one of its predecessors*, Stauffer California. There is no basis whatever in the statute for any such action, nor is there any statutory basis for an allocation as now urged by petitioner. And the plain reason why the problem is not dealt with in these otherwise exceedingly comprehensive provisions is that an (F) reorganization was regarded as involving only one corporation.

The Code is an extraordinarily complex and sensitive instrument, and we should be careful not to give an interpretation to one provision that would generate unintended difficulties in respect of other provisions, unless such interpretation is clearly called for by the statute itself. In the situation before us we can find no such command in the statute requiring the fusion of these three corporations to be treated as a "mere change in identity, form, or place of organization." To the contrary, the indications point the other way.

Petitioner's strongest reliance perhaps is upon our decision in *Pridemark, Inc.*, 42 T.C. 510, reversed 345 F. 2d 35 (C.A. 4), where two corporations had been liquidated after disposing of a substantial portion of their business assets and where, after the lapse of a period of time, the remaining assets were transferred to a new corporation. The case arose in the difficult area of liquidation-reincorporation, and this Court held that there had been an (F) reorganization. The briefs on this issue were skimpy, and it is obvious that the Court did not have the benefit of a presentation of materials like the one before us. Upon appeal, the Court of Appeals held that there was no reorganization at all on the facts without specifically considering whether the unification of multiple corporations could qualify under (F). We think that our decision in *Pridemark* was wrong and it will no longer be followed to the extent that it is inconsistent with our conclusion herein.

Petitioner's position is also supported by an alternative holding in *Davant* v. *Commissioner*, 366 F. 2d 874 (C.A. 5), modifying 43 T.C. 540, which held that a transaction involving the unification of the

---

the (E) and the (F) reorganization situations, is the case in which a single corporation has more than one class of stock, and stock of a disqualified class (e.g., any class which cannot be considered common stock) is given up by the taxpayer, along with qualified stock, in exchange for common stock either of the same corporation (the (E) reorganization) or the successor corporation (in an (F) reorganization). See sec. 1.1244(d)–3(c)(3), examples (*i*) and (*ii*), Income Tax Regs.

businesses of more than one active corporation qualified as a reorganization under both (D) and (F). Like *Pridemark*, this case arose in the liquidation-reincorporation field, where it was to the Government's advantage to urge that there had been a tax-free reorganization. When the case was before this Court, we had held that there was a (D) reorganization and carefully refrained from characterizing the transaction in relation to (F). The Government's brief on appeal made no effort to support our decision on the ground that there had been an (F) reorganization, and the opinion of the Court of Appeals was rendered without the benefit of any comprehensive analysis of counsel of the matter. When the taxpayer petitioned the Supreme Court for certiorari, the Government's brief in opposition did not undertake in any way to support the conclusion of the Court of Appeals in respect of the applicability of (F), and defended the decision solely on the ground that there had been a (D) reorganization in that case. Certiorari was denied, 386 U.S. 1022. With all due respect to the Court of Appeals, we do not accept its interpretation of subparagraph (F).

Petitioner also relies heavily upon a ruling of the Internal Revenue Service, Rev. Rul. 58-422, 1958-2 C.B. 145, and contends that it deals with a situation indistinguishable from the present case. Apart from the fact that we are not bound by that ruling, we think it is distinguishable. The facts in that case involve a parent corporation that was to be reincorporated in another State, and at the same time acquire the assets of its two wholly owned subsidiaries. The Service ruled that the reincorporation of the parent would be an (F) reorganization. No such ruling was given in respect of the subsidiaries, and since the subsidiaries or their businesses were always under the same corporate umbrella of the parent, both before and after the reorganization, it is plain that the situation presented in the ruling is not the same as the one before us.[9]

Finally, petitioner makes two alternative arguments on this issue, one, that there were three separate (F) reorganizations whereby each of the old Stauffer companies merged into Stauffer New Mexico, and, two, that in any event there was at least one (F) reorganization whereby Stauffer California merged into Stauffer New Mexico. We think that neither of these alternatives is sound.

The merger agreement specifically stated that it would not be binding upon any of the constituent corporations, their officers, or stockholders until a copy of the agreement and any other certificates and documents

---

[9] Also distinguishable is our recent decision in *Dunlap & Associates, Inc.*, 47 T.C. 542, where the reincorporation of a parent corporation in another State was held to be an (F) reorganization, a result that was unaffected by the parent's subsequent acquisition of outstanding minority interests in two subsidiary corporations through an exchange of stock.

required by law were properly filed and recorded with the proper governmental authority of all four States. Even if Stauffer California complied with the laws of its jurisdiction before Stauffer Illinois and Stauffer New York did so, a finding we cannot make on the state of this record, by the terms of the merger agreement there was no valid merger between any of the corporations until the laws of all the States involved had been complied with. Thus, the three old Stauffer companies merged into Stauffer New Mexico not *seriatim* but simultaneously. Either all three were parties to the (F) reorganization or none were. The three mergers were interdependent. They cannot be fragmented, nor can one of them be singled out as an (F) reorganization as was possible in the case of the parent corporation in Rev. Rul. 58–422.

We hold that the statutory merger herein, although qualifying as a reorganization under (A), did not satisfy the more rigorous definition in (F) as "a mere change in identity, form, or place of organization." Accordingly, section 381(b)(1) required that the taxable year of the three old Stauffer companies come to an end when they transferred their businesses to the new corporation, and section 381(b)(3) explicitly forbade the carryback of the new corporation's net operating loss to a prior taxable year of any of the old companies.

2. *Write-down of Inventory as of September 30, 1959.*—Pursuant to his determination that the merger of the three old Stauffer companies into Stauffer New Mexico was not an (F) reorganization, the Commissioner computed the taxable income of each of the old corporations for the 8-month period from February 1, 1959, the beginning of a new fiscal year for each corporation, to September 30, 1959, the last full day of their tax lives under section 381(b)(1). In computing the cost of goods sold during that period he took the closing September 30, 1959, inventories at book value or cost. Each of the old Stauffer companies had consistently used the lower of cost or market method of valuing inventories, and petitioner now argues that there should be a retroactive downward revision of the inventories as of September 30, 1959, in the aggregate amount of $1,311,062 which it is contended, is necessary to reflect a drop in market value below cost as of that date.

A spirited controversy has developed between the parties as to whether "market" value in this context means the taxpayer's reproduction or replacement cost, as urged by the Government, or whether it means "net realizable value," as argued by petitioner. Taking the position in substance that the inventories did not have a fair market value equal to their cost and that the net realizable value was $1,311,062 less than cost, petitioner claims that the inventories must be written down by that amount. We need not resolve the controversy between

the parties as to which concept of "market" is properly to be applied here, because as we evaluate the evidence before us petitioner has failed to prove that net realizable value of the inventories was less than cost on September 30, 1959.

Petitioner presented no direct evidence as to value on September 30, 1959, and the valuations upon which it relies consist merely of the results of computations made by the accounting firm of Price, Waterhouse & Co. in 1963, which in turn were based in large part upon the facts as they existed on January 31, 1961, the date as of which the actual write-down of inventory was made on the Stauffer books. In our view no such write-down was justified as of September 30, 1959.

The underlying theory of petitioner's position is that Stauffer's tarnished image as the result of unfavorable publicity made its products generally unsalable and that they could not profitably have been sold as of September 30, 1959.[10] We think that conclusion is not warranted by the evidence.

The record of Stauffer sales for the month of September 1959 itself goes far to undercut petitioner's position. Although the highly critical statement of the Secretary of Health, Education, and Welfare was issued on September 2, 1959, sales (in units) of Stauffer products for that month were the highest of any month since May of that year, and they in fact exceeded sales for September of the previous year. It is quite true that sales began to fall off shortly thereafter. There was a marked but not critical drop in October, a further sharp reduction in November, but it was not until December and the months of the following year that a devastatingly low level of sales was reached. Meanwhile, the new company continued to manufacture its products at least for some months, and there was no general reduction in prices. Indeed, although the wholesale price of model S–1 was reduced in January 1960 from $144.75 to $124, it was raised in June 1960 back to $144.75, its price on September 30, 1959. Also, the $80 wholesale price of model L, the second most popular model in October 1959, was raised to $99.75 at the beginning of the following month, and its suggested retail price was simultaneously increased from $149.50 to $199.50.

Moreover, as late as February 12, 1960, Stauffer management submitted financial statements to the Bank of America showing January 31, 1960, inventories at cost without any reduction for any alleged decrease in market value. And such inventories at cost as of January 31, 1960, were still being used in the income tax return filed somewhat more than a month later, on March 15, 1960, on behalf of Stauffer New Mexico. Even as late as August 3, 1960, Bernard H. Stauffer was still

---

[10] To the extent that this position is also based on Stauffer's increased and aggressive competition, beginning in 1958, it is without any merit. In the face of such competition the three old Stauffer companies realized an aggregate net profit of $1,492,077 for the 8-month period ending Sept. 30, 1959.

highly optimistic not only about being able to sell the inventory on hand, but about resuming profitable operations in the near future.[11]

We need not discuss the record further in respect of this matter. We have taken it fully into account and have concluded that the net realizable value of the inventories was not less than cost as of September 30, 1959. The fact that unfavorable publicity began in September 1959 is not enough. It was the sort of thing that could conceivably have had but very little permanent effect upon sales or profits. One would hardly have expected the tobacco companies to revalue their inventories of cigarettes below cost after a report of the Surgeon General of the United States pointing out the correlation between cigarette smoking and lung cancer or heart disease. The record establishes here that Stauffer sales held firm in September 1959 and in fact showed an increase. We find that there is no basis upon which to justify a downward revision of inventory values as of September 30, 1959. The fact that a ground for such reduction existed on January 31, 1961, or possibly even at an earlier date, does not warrant a push-back of that date to September 30, 1959.

3. *So-called "erroneous assessment" Issue.*—As a result of the conclusion that the merger of the old Stauffer companies into Stauffer New Mexico was not an (F) reorganization, it is undisputed that Stauffer New Mexico was prohibited under section 381(b)(3) from carrying back its fiscal 1961 net operating loss to the fiscal years 1958 and 1959 of any of its predecessors. However, based upon such claimed carryback, Stauffer New Mexico applied for and in fact received a refund of the full amount of taxes paid by Stauffer California for fiscal 1958 ($1,-481,653 tax plus $12,035.89 interest), and a portion of the taxes paid by Stauffer California for fiscal 1959 ($263,194 tax plus $2,138 interest). Although the claim for refund did not identify Stauffer California as the predecessor taxpayer, it is plain on this record and undisputed by the parties that such taxes were in fact those of Stauffer California that were refunded. Indeed, all of the figures set forth in that claim with respect to the income reported and tax previously determined for the fiscal years 1958 and 1959 related exclusively to Stauffer California. The refund was claimed under the so-called "quickie" refund procedure of section 6411 of the 1954 Code which directs the Secretary or his delegate to make a refund within 90 days of the application for a tentative allowance of a net operating loss carryback subject only to a limited review of such application. Accordingly, if there has been a refund of Stauffer California's 1958

---

[11] Of course, objective facts as they existed on the pertinent date or dates rather than the beliefs of management may be controlling, cf. *C–O Two Fire Equipment Co.* v. *Commissioner*, 219 F. 2d 57 (C.A. 3), reversing 22 T.C. 124, but such views, particularly those of top management that has had extensive experience in respect of the product, appear to be relevant in arriving at objective facts relating to salability of the product.

and 1959 taxes based upon a net operating loss carryback deduction to which it was not entitled, there would result a deficiency [12] in Stauffer California's 1958 and 1959 taxes [13] which the Commissioner determined herein.

Petitioner contends, however, that if the merger did not qualify as an (F) reorganization, Stauffer New Mexico must be regarded as an entirely different taxpayer from Stauffer California, that Stauffer California's taxes were in effect refunded to a stranger, namely, Stauffer New Mexico, that there was thus no proper refund of Stauffer California's taxes, with the consequence that there can be no deficiency in Stauffer California's 1958 and 1959 taxes based upon such refund. We hold that the point is without merit.

While it is quite true that Stauffer New Mexico cannot be regarded as the same taxpayer as Stauffer California under section 368(a)(1) (F), it was nevertheless the successor to Stauffer California as the result of a statutory merger under section 368(a)(1)(A) and had full standing to apply for and receive a refund of Stauffer California's taxes. Rev. Rul. 54-17, 1954-1 C.B. 160. If such refund were erroneously made, as was the situation in this case, there resulted a deficiency in Stauffer California's taxes (not Stauffer New Mexico's taxes), which the Commissioner was entitled to collect from the ultimate transferee of Stauffer California's assets, namely, the petitioner herein. To be sure, the claim for refund should have identified Stauffer California as the taxpayer, but there was never any doubt that the refund sought and received related to taxes paid by Stauffer California. Stauffer New Mexico was not even in existence during the 2 fiscal years in question, and it is difficult to see how the Commissioner could have determined deficiencies against it in respect of the improper refund.

---

[12] SEC. 6211. DEFINITION OF A DEFICIENCY.

(a) IN GENERAL.—For purposes of this title in the case of income, estate, and gift taxes, imposed by subtitles A and B, the term "deficiency" means the amount by which the tax imposed by subtitles A or B exceeds the excess of—

    (1) the sum of

        (A) the amount shown as the tax by the taxpayer upon his return, if a return was made by the taxpayer and an amount was shown as the tax by the taxpayer thereon, plus

        (B) the amounts previously assessed (or collected without assessment) as a deficiency, over—

    (2) the amount of rebates, as defined in subsection (b)(2), made.

(b) RULES FOR APPLICATION OF SUBSECTION (a).—For purposes of this section—

\*       \*       \*       \*       \*       \*       \*

    (2) The term "rebate" means so much of an abatement, credit, refund, or other repayment, as was made on the ground that the tax imposed by subtitles A or B was less than the excess of the amount specified in subsection (a)(1) over the rebates previously made.

[13] Although the deficiency determined for fiscal 1958 was in the full amount of the refund taxes for that year ($1,481,653.05), the deficiency determined for fiscal 1959 ($213,472.25) was less than the full amount of the refunded taxes for fiscal 1959 because a $49,721.79 deficiency assessment for the same year in relation to another matter had previously been paid by Bernard H. Stauffer as transferee.

When that refund was made, deficiencies arose in Stauffer California's taxes for its fiscal years 1958 and 1959. We hold that the Commissioner proceeded properly in determining the deficiencies and transferee liability herein.

Reviewed by the Court.

*Decisions will be entered for the respondent.*