793 F.2d 864
 58 A.F.T.R.2d 86-5248, 86-1 USTC P 9483
 NATIONAL TEA CO., and Consolidated Subsidiaries, as
successor to National Supermarkets, Inc., formerly
National Food Stores of Louisiana, Inc.,
Petitioner-Appellant,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.
 No. 85-1484.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 12, 1986.
Decided June 16, 1986.
 
 Edward C. Rustigan, Mayer, Brown & Platt, Chicago, Ill., for petitioner-appellant.
 Jonathan S. Cohen, Asst. Atty. Gen., Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellee.
 Before CUMMINGS, Chief Judge, and COFFEY and RIPPLE, Circuit Judges.
 CUMMINGS, Chief Judge.
 
 
 1
 This case comes to us on appeal from the United States Tax Court, 83 T.C. 8, which granted summary judgment in favor of the respondent Commissioner of Internal Revenue ("Commissioner") against the petitioner National Tea Co. and Consolidated Subsidiaries ("National Tea"). The issue raised is whether an acquiring corporation, which seeks to carryback net operating losses it incurred subsequent to a reorganization (stipulated by the parties to be a reorganization as defined by Section 368(a)(1)(F) of the Internal Revenue Code, i.e., an "F" reorganization) to income earned by the transferor corporation before the reorganization, must meet the loss-tracing requirement adopted by the Commissioner in Rev.Rul. 75-561, 1975-2 C.B. 129, based on the Supreme Court's decision in Libson Shops, Inc. v. Koehler, 353 U.S. 382, 77 S.Ct. 990, 1 L.Ed.2d 924 For the reasons set forth below, we agree with the well-reasoned decision of the Tax Court that National Tea must follow this so-called Libson Shops loss-tracing rule. National Tea does not satisfy this rule, so that its claimed loss carryback must be denied.
 
 
 2
 * Since the facts have been fully stipulated and are well defined by the Tax Court in its opinion, only a brief summary is required. Supermarkets was a Louisiana corporation that operated a chain of retail food stores in and around New Orleans. National Tea is an Illinois corporation, which along with its subsidiaries operates a chain of retail food stores in various areas of the United States. In 1954 National Tea acquired approximately 98% of the outstanding stock of Supermarkets, and continued to acquire stock so that by December 26, 1974, National Tea owned 99.98% of the outstanding stock of Supermarkets. From 1954 until December 26, 1974, Supermarkets operated as part of National Tea's single integrated retail marketing operation of retail food stores.
 
 
 3
 On December 26, 1974, Supermarkets transferred all of its assets to National Tea, and Supermarkets' separate corporate existence ceased. This merger was accomplished under the applicable short-form Merger Statutes of Illinois and Louisiana. Supermarkets' other shareholders received cash in exchange for their aggregate 0.02% interest. For the taxable year ending December 28, 1974, National Tea and its affiliated subsidiaries incurred a substantial loss, which included a net operating loss of $3,304,858 subject to the carryover and carryback[1] provisions of Section 172. No part of this $3,304,858 net operating loss was attributable to the New Orleans regional organization, which had been operated by Supermarkets prior to December 26, 1974, and by National Tea thereafter.
 
 
 4
 National Tea attempted to carryback this net operating loss of $3,304,858 to Supermarkets' taxable year ending April 1, 1972, and thereby use this post-reorganization net operating loss to offset Supermarkets' pre-reorganization income. Such a carryback would result in an income tax refund totalling $1,586,332. National Tea's argument for being able to carryback this net operating loss is that the 1974 merger of Supermarkets into National Tea was an "F" reorganization, and that the general prohibition of Section 381(b)(3) against the carryback of post-reorganization losses incurred by the acquiring company (National Tea in the instant case) to a pre-reorganization year of the transferor corporation (Supermarkets in the instant case) does not apply. Furthermore, National Tea contends that any judicially created restrictions on loss carrybacks that existed under the 1939 Code were overruled when Congress adopted the 1954 Code, and therefore National Tea does not have to satisfy those restrictions, such as the Libson Shops loss-tracing rule of Libson Shops, Inc. v. Koehler, 353 U.S. 382, 77 S.Ct. 990, 1 L.Ed.2d 924, which are not set out in the later Code. The Internal Revenue Service concedes that the 1974 merger was an "F" reorganization, consistent with its position in Rev.Rul. 75-561, 1975-2 C.B. 129. However, the Commissioner claims that National Tea must satisfy the loss-tracing rule first adopted by the Supreme Court in 1957 in Libson Shops, and subsequently adopted by the Service in Rev.Rul. 75-561, 1975-2 C.B. 129. This loss-tracing rule limits the carryback of a post-reorganization net operating loss incurred by the acquiring corporation to a pre-reorganization year of the transferor corporation to those cases where the net operating loss was generated by "a separate business unit or division [of the acquiring corporation] formerly operated by the transferor corporation." Rev.Rul. 75-561, 1975-2 C.B. 129.
 
 
 5
 Thus the issue for us to decide is the validity of the Commissioner's applying the Libson Shops loss-tracing rule to an attempted carryback of a net operating loss incurred by the acquiring corporation after an "F" reorganization to income realized by the transferor corporation in a taxable year prior to the "F" reorganization.[2] To answer this difficult statutory question, it is necessary to review the tortuous history of the "F" reorganization concept, so that the meaning and intent behind Congress' exception of "F" reorganizations from the general prohibition of carrybacks enacted in Section 381(b)(3) can be understood.
 
 II
 
 6
 The "F" reorganization is one of many different types of reorganizations described in Section 368. If an acquisition can be classified as a reorganization (which involves meeting certain judicially created doctrines as well as several different statutory sections of Subchapter C of the Code), then as a general rule no gain is recognized. Significantly for the instant case, another result that flows from the classification of an asset acquisition as a reorganization is that under Sections 381-383, the tax attributes of the transferor corporation are carried over to the acquiring corporation. One such tax attribute is net operating losses, the concern of this case.
 
 
 7
 Unlike some of the other types of reorganizations in Section 368(a), which feature rather complex definitions, the definition of an "F" reorganization has always been comparatively and indeed deceptively simple: "a mere change in identity, form, or place of organization." Section 368(a)(1)(F). Two of the three clauses in this definition seem fairly clear. A "mere change in identity" refers to a change in a corporation's name, and a "mere change in ... place of organization" refers to a decision to reincorporate in another state. However, the meaning of "a mere change in ... form" has proven to be more elusive.
 
 
 8
 There is a strong case to be made that "a mere change in ... form" was meant to cover only the simplest types of corporate restructurings, such as the "cosmetic" types of changes described above, and was never intended to include a reorganization of two or more operating corporations. The "F" reorganization first appeared in the Revenue Act of 1921, which defined it as a "mere change in identity, form, or place of organization of a corporation " (emphasis supplied). Although the phrase "of a corporation" was deleted in the Revenue Act of 1924, the House Ways and Means Committee explained the deletion as "minor changes in phraseology," H.R.Rep. No. 179, 68th Cong., 1st Sess. 13, and there was no indication that Congress intended this change to have any significance. Estate of Stauffer v. Commissioner, 48 T.C. 277, 299 (1967), reversed, 403 F.2d 611 (9th Cir.1968). For the next thirty years the definition remained unchanged, and the courts did little during this time to delineate the boundaries of this definition; the cases they faced dealt chiefly with simple restructurings of a single operating corporation. See McManus, Judicial Law-Making: The Liquidation of a Corporation Treated as an F Reorganization, 2 J.Corp. Tax'n 273, 285-286, 286 n. 44 (1975), and cases collected therein. The definition remained unchanged in the 1954 Code and continued unchanged through the relevant time period for purposes of deciding the instant case. See supra note 2. The Tax Court has noted several times that, based on this legislative history, Congress never intended that an "F" reorganization should encompass the merger of multiple operating corporations. Estate of Stauffer, 48 T.C. at 299-302; Associated Machine, Inc. v. Commissioner, 48 T.C. 318, 328 (1967), reversed, 403 F.2d 622 (9th Cir.1968); Romy Hammes, Inc. v. Commissioner, 68 T.C. 900, 906 n. 8, 908 (1977). Numerous commentators have carefully analyzed the history of the "F" reorganization and concluded that Congress never intended that a reorganization involving multiple operating corporations could be classified as an "F" reorganization. See Metzer, An Effective Use of Plain English--The Evolution and Impact of Section 368(a)(1)(F), 32 Tax Lawyer 702, 704-708 (1979); Solomon, The Judicially Expanded "F" Reorganization and its Uncertain Operating Rules, 7 J. Corp. Tax'n 24, 26 (1980); McManus, 2 J.Corp. Tax'n 273, 285-286; Comment, (F) Reorganization and Proposed Alternate Routes for Post Reorganization Net Operating Loss Carrybacks, 66 Mich.L.Rev. 498, 509-510 (1968); Note, Section 368(a)(1)(F) and Loss Carrybacks in Corporate Reorganizations, 117 U.Pa.L.Rev. 764, 772 (1969). Until the mid-1960's, such an argument was entirely consistent with existing case law. See Note, 117 U.Pa.L.Rev. 764, 772. Indeed, until that time, the "F" reorganization was seldom used and not considered a significant type of reorganization. See McManus, 2 J.Corp. Tax'n 273; Note, 117 U.Pa.L.Rev. 764, 772; Bittker & Eustice, FEDERAL INCOME TAXATION OF CORPORATIONS AND SHAREHOLDERS p 14.18 (4th Ed.1979) (hereinafter referred to as "Bittker & Eustice").
 
 
 9
 In the late 1960's, to everyone's surprise, several cases judicially expanded the definition of an "F" reorganization to include a merger of multiple operating corporations in certain circumstances. The judicial expansion began, ironically enough, with a decision in favor of the Commissioner. The problem facing the Commissioner was the liquidation-reincorporation scheme, whereby A, a group of shareholders who own corporation X, are able to withdraw a substantial amount of X's appreciated corporate assets at capital gains rates while keeping the assets in corporate solution (such as reincorporating the assets in corporation Y, also owned by A). There were several ways to achieve this result, see Metzer, 32 Tax Lawyer 702, 716-717, but one way was for A to sell their X stock to an unrelated third party B, have B sell the assets of X to Y (another existing corporation also owned by A), have B liquidate X, and let B take a reasonable profit for his services. For this scheme to succeed, A must avoid having the transaction reclassified as a reorganization. This precise version of the liquidation-reincorporation scheme was litigated in the case of Davant v. Commissioner, 366 F.2d 874 (5th Cir.1966), certiorari denied, 386 U.S. 1022, 87 S.Ct. 1370, 18 L.Ed.2d 460. The Commissioner decided to attack this scheme by arguing that since Y was merely the alter ego of X, this was nothing more than "a change in corporate vehicles but not a change in substance," Davant, 366 F.2d at 884, and hence an "F" reorganization. Although the Commissioner had raised this argument in previous cases, see Metzer, 32 Tax Lawyer 702, 720-722, in Davant the Commissioner won for the first time. See Note, 117 U.Pa.L.Rev. 764, 772-773 (describes Davant and the arguments raised in the case).
 
 
 10
 Davant, however, turned out to be a Pyrrhic victory. Because the general rule of Section 381(b)(3)--that an acquiring corporation cannot carryback post-reorganization net operating losses to income of the transferor corporation--has an explicit exception for "F" reorganizations, and Davant greatly expanded the definition of an "F" reorganization to include certain mergers of multiple operating corporations, the door was now open for an acquiring corporation to carryback net operating losses to a transferor corporation in many more transactions than had been previously thought possible. See Note, 117 U.Pa.L.Rev. 764, 776. It is not clear whether the Commissioner or the Fifth Circuit realized this significant result of the Davant opinion, but taxpayers wasted no time in taking advantage of it. The issue arose in two types of transactions: the liquidation of a wholly-owned subsidiary into its parent (such as the instant case), and the merger of two corporations owned by the same shareholders.[3] In both types of transactions, courts held that so long as there is (1) an identity of the shareholders and their proprietary interests in both the transferor corporation and the acquiring corporation (in the context of a liquidation of a wholly-owned subsidiary into the parent corporation, this was satisfied if the parent corporation's shareholders and their proprietary interests did not change); and (2) the business enterprise of the transferor corporation continued unimpaired, these transactions were both "F" reorganizations, and therefore the acquiring corporation could carryback post-reorganization net operating losses against pre-reorganization income of the transferor corporation under Section 381(b)(3). See, e.g., Performance Systems, Inc. v. United States, 382 F.Supp. 525 (M.D.Tenn.1973), affirmed per curiam, 501 F.2d 1338 (6th Cir.1974) (merger of subsidiary into parent); Movielab, Inc. v. United States, 494 F.2d 693 (Ct.Cl.1974) (merger of subsidiary into parent); Home Construction Corp. v. United States, 439 F.2d 1165 (5th Cir.1971) (merger of corporations owned by same shareholders); Estate of Stauffer v. Commissioner, 403 F.2d 611 (9th Cir.1968) (merger of corporations owned by same shareholders); Associated Machine, Inc. v. Commissioner, 403 F.2d 622 (9th Cir.1968) (merger of corporations owned by same shareholders); Eastern Color Printing Co. v. Commissioner, 63 T.C. 27 (1974) (merger of subsidiary into parent). The Commissioner initially opposed these decisions, but faced with this overwhelming number of contrary cases, he finally acquiesced and agreed that the combination of two or more corporations may qualify as an "F" reorganization so long as both of the two requirements enumerated in the previously cited cases were satisfied and that both the transferor and acquiring corporation continued to be engaged in the same business activities as before the merger. Rev.Rul. 75-561, 1975-2 C.B. 129. All of these requirements are met in the instant case, and the parties have stipulated that the 1974 merger between National Tea and Supermarkets qualifies as an "F" reorganization.
 
 
 11
 As the above demonstrates, the expansion of the "F" reorganization to cover a merger of the type executed by National Tea and Supermarkets occurred because of judicial decisions decided well after Congress adopted the statutory definition of an "F" reorganization, and not because of any legislative decisions made by Congress. The significance of this evolution of the "F" reorganization is that it aids us in understanding and applying the exception for "F" reorganizations to the general prohibition of carrybacks of an acquiring corporation's post-reorganization net operating losses to the transferor corporation's pre-reorganization income as contained in Section 381(b)(3) and discussed in part III.
 
 III
 
 12
 Prior to 1954, the Internal Revenue Code did not explicitly deal with carryovers and carrybacks in the context of a corporate reorganization. Rather, the Code merely stated that if a "taxpayer" had a net operating loss, such a loss could be carried over or carried back a certain number of years, without further defining the term "taxpayer." This left it to the courts to determine whether a corporation after a reorganization was the same "taxpayer" as a corporation before a reorganization. Various theories were developed by the courts to deal with this concern: some courts felt that a corporation after a reorganization was a different entity and hence not the same taxpayer as the corporation was before the reorganization, while other courts focused on a "continuity of business enterprise" theory and held that the acquiring corporation in a reorganization was the same taxpayer as the previous operating corporation since the acquiring corporation was continuing in business. See generally Metzer, 32 Tax Lawyer at 735-737. Congress was aware that these judicially created doctrines were "uncertain and frequently contradictory," and often turned on legal formalities such as the identity of the surviving corporation rather than on economic realities, and Congress wanted to correct this situation in adopting the 1954 Tax Code. H.R.Rep. No. 1337, 83d Cong., 2d Sess. 41, reprinted in [1954] U.S.Code Cong. & Ad.News 4017, 4066-4067; S.Rep. No. 1622, 83d Cong., 2d Sess. 52-53, reprinted in [1954] U.S.Code Cong. & Ad.News 4621, 4683-4684.
 
 
 13
 Even if a net operating loss was allowed to be carried across the time period when multiple corporations were merged, there was the further concern of whether a net operating loss should be able to offset income generated by a business if that same business did not generate the net operating loss. This issue potentially generated complex accounting problems, for if corporations A, B, and C merged into corporation X, and X wanted to carryover a pre-merger loss incurred by A against post-merger income earned by X, it was difficult to ascertain how much of X's post-merger income was attributable to the business formerly operated by A, as opposed to the businesses formerly operated by B and C. See Sinrich, Libson Shops--An Argument Against Its Application Under the 1954 Code, 13 Tax L.Rev. 167, 174 (1958) (enormous complexity of such a loss-tracing rule). This exact issue was dealt with by the Supreme Court in Libson Shops, Inc. v. Koehler, 353 U.S. 382, 77 S.Ct. 990, 1 L.Ed.2d 924. The Supreme Court there adopted precisely the loss-tracing rule just described and denied the loss carryovers because this rule was not satisfied: the income against which the net operating loss was carried over was not produced by substantially the same businesses which originally incurred the losses. Although this decision was handed down after the 1954 Code was adopted, Congress was well aware of these complex accounting problems involved in the carryback and carryover of losses when multiple operating corporations merged. Hearings on H.R. 8300 Before the Senate Committee on Finance, 83d Cong., 2d Sess. 405 (1954) (supplemental statement of A.B.A. Section of Taxation) (hereinafter referred to as "Hearings"). As previously noted, the Commissioner has adopted the Libson Shops loss-tracing rule for "F" reorganizations, 75 Rev.Rul. 561, 1975-2 C.B. 129, and attempts to apply this rule in the instant case.
 
 
 14
 Well aware of all of the complexities involved in regulating the concerns raised by carryovers and carrybacks in the context of multi-corporate reorganizations, Congress essentially made two different decisions: one decision regarding carryovers and another regarding carrybacks. With respect to carryovers, Congress adopted its own elaborate scheme to regulate carryovers in the context of a reorganization; this scheme is contained in Sections 381 and 382 of the 1954 Code. See generally Bittker & Eustice at paragraphs 16.11-16.14, 16.22-16.25. This statutory regulatory scheme displaced the previous judicially created regulatory schemes with respect to carryovers; Congress specifically stated that it was attempting to replace the confusion and artificiality that resulted from the judicially created regulatory schemes. H.R.Rep. No. 1337, 83d Cong., 2d Sess. 41, reprinted in [1954] U.S.Code Cong. & Ad.News 4017, 4066-4067; S.Rep. No. 1622, 83d Cong., 2d Sess. 52-53, reprinted in [1954] U.S.Code Cong. & Ad.News 4621, 4683-4684.
 
 
 15
 With respect to carrybacks, however, Congress made a quite different legislative decision. Instead of devising a statutory scheme to regulate the problems created by carrybacks, Congress decided to prohibit completely the carryback of post-reorganization losses of the acquiring corporation to pre-reorganization income of the transferor corporation, except in the case of an "F" reorganization. Section 381(b)(3). This decision to allow carrybacks in the context of an "F" reorganization but not to create any statutory scheme to regulate these carrybacks can be explained in only one way: in 1954 Congress never envisioned the "F" reorganization as encompassing the merger of multiple operating corporations, and for this reason never imagined net operating loss carrybacks in the context of an "F" reorganization as triggering the same type of complex problems created by carrybacks in the context of the reorganization of multiple operating corporations. Congress simply did not intend to leave unregulated the problems created by carrybacks in the context of a reorganization of multiple operating corporations. A review of the available evidence yields much support for this explanation of the exception for an "F" reorganization from the general prohibition of Section 381(b)(3).
 
 
 16
 First, the evolution of the "F" reorganization chronicled in part II of this opinion demonstrates that as of 1954 no one envisioned "F" reorganizations as encompassing the merger of multiple operating corporations. See Metzer, 32 Tax Lawyer at 704-708; Solomon, 7 J.Corp. Tax'n at 26; McManus, 2 J.Corp. Tax'n at 285-286; Comment, 66 Mich.L.Rev. at 509-510; Note, 117 U.Pa.L.Rev. at 772. The "F" reorganization was viewed as covering simplistic corporate restructurings such as a change in identity or a reincorporation in a new location. Not until the Internal Revenue Service opened the proverbial Pandora's box in the Davant case was there any authority for the proposition that the merger of two operating corporations could be an "F" reorganization. Given the prevailing view of an "F" reorganization at the time when the 1954 Code was drafted, Section 381(b)(3) cannot be viewed as expressing Congressional intent to allow net operating loss carrybacks, without any regulatory limits, in an "F" reorganization involving multiple operating corporations.
 
 
 17
 Second, the "F" reorganization exception was not presented to Congress as including a reorganization of multiple operating corporations. In arguing for the exception for "F" reorganizations, the tax bar assumed that the reorganization would involve only one corporation. Because of this premise, the exception would not involve any of the complex accounting problems that would arise if the reorganization involved multiple operating corporations. See Hearings at 405, 1543 (statements of A.B.A., Section of Taxation, and the New York State Bar Association). There is no evidence that the "F" reorganization exception adopted by Congress was intended to be any different from the one presented to Congress by the tax bar.
 
 
 18
 Third, when Congress was explicitly presented with the opportunity to permit loss carrybacks without any regulatory limits of the type urged by the taxpayer in the instant case, it declined to do so. Both the American Bar Association and the New York State Bar Association urged Congress to allow a parent corporation which sustained net operating losses after the liquidation of a wholly-owned subsidiary to carryback such losses to income earned by the subsidiary corporation before the corporation. See McManus, 2 J. Corp. Tax'n at 282-283, citing Hearings at 405, 1531, 1543. Despite being presented with both this suggestion and the statutory language to implement it, Congress never adopted it. See McManus, 2 J. Corp. Tax'n at 283.
 
 
 19
 Fourth, the examples given in the Senate committee report demonstrate that Congress did not intend to allow net operating loss carrybacks in a reorganization involving multiple operating corporations.
 
 
 20
 For example, assume corporations X and Y transfer on December 31, 1954, all their property to Z in a transaction described in subparagraph of section 368(a)(1). If Z has a net operating loss in 1955, such loss cannot be carried back to a taxable year of X or Y. Or, assume corporation X merges into corporation Y on December 31, 1954, in a statutory merger with Y's charter continuing after the merger. If Y has a net operating loss in 1955, such loss cannot be carried back to a taxable year of X but shall be a carryback to a taxable year of Y. If, however, corporation X, in a reorganization described in subparagraph (F) of section 368(a)(1), merely changes its identity, form, or place of organization, the resulting corporation is entitled to carry back its net operating loss to a taxable year of X prior to the reorganization. S.Rept. 1622, 83d Cong., 2d Sess. 276, reprinted in [1954] U.S.Code Cong. & Ad.News 4785, 4915. See also H.R.Rep. No. 1337, 83d Cong., 2d Sess. 41, reprinted in [1954] U.S.Code Cong. & Ad.News 4137, 4273.
 
 
 21
 Notice that the first two examples include the two types of transactions which courts in the aftermath of Davant have held to be "F" reorganizations. The report denies the carryback of the acquiring corporation's net operating losses incurred after the reorganization to a pre-reorganization taxable year of the transferor corporation in both of these examples. The example given by the report to illustrate the "F" reorganization exception in Section 381(b)(3) involves a reorganization of a single operating corporation.
 
 
 22
 The evidence is thus overwhelming that Congress never intended the exception for "F" reorganizations contained in Section 381(b)(3) to allow the unregulated carryback of post-reorganization losses of the acquiring corporation to pre-reorganization income of the transferor corporation where the reorganization involved multiple operating corporations. Congress was aware of the complex problems of carryovers and carrybacks with reorganizations involving multiple operating corporations, and Congress decided to replace the previous judicial solutions to these problems with its own statutory solution. But since Congress never contemplated that carryback in the context of "F" reorganizations would also feature these problems, Congress never fashioned a statutory scheme to regulate these carrybacks.[4] Yet the Commissioner has conceded that the reorganization of multiple operating corporations can be an "F" reorganization, and Section 381(b)(3) does explicitly exempt "F" reorganizations from the general prohibition against loss carrybacks. Given these parameters, we hold that the loss-tracing rule of Libson Shops must survive as a necessary gap-filler to regulate the carryback of the acquiring corporation's net operating losses after an "F" reorganization to the transferor corporation's income earned before the "F" reorganization. It is fair to conclude that the Libson Shops loss-tracing rule and other judicially created schemes have been displaced for carryovers, since Congress has adopted its own statutory scheme in Sections 381 and 382 to regulate carryovers. For carrybacks, however, the same conclusion cannot be reached, since for carrybacks Congress failed to create a statutory scheme to replace the judicially created schemes, having never foreseen these problems arising with "F" reorganizations. Admittedly, it cannot be said that Congress intended the pre-1954 judicially created schemes to survive for carrybacks in the context of "F" reorganizations, but that is only because Congress never foresaw the tremendous judicial expansion of the definition of an "F" reorganization that occurred in the late 1960's.
 
 
 23
 Our analysis of this issue dovetails nicely with the results reached by other courts. Both the Fifth and Ninth Circuits have applied the Libson Shops loss-tracing rule to regulate the carryback of an acquiring corporation's post-reorganization net operating loss to the transferor corporation's pre-reorganization income in the context of an "F" reorganization. Home Construction Corp. of America v. United States, 439 F.2d 1165 (5th Cir.1971)[5]; Associated Machine v. Commissioner, 403 F.2d 622 (9th Cir.1968); Estate of Stauffer v. Commissioner, 403 F.2d 611 (9th Cir.1968). Our holding today is also consistent with the Second Circuit's decision in Aetna Casualty & Surety Co. v. United States, 568 F.2d 811 (2d Cir.1976). Although the Second Circuit never discussed the Libson Shops loss-tracing rule in allowing the carrybacks in that case, the court did note that the carryback did not trigger "the accounting problems which motivated section 381(b)(3)," and consequently it can be safely assumed that the result in that case is consistent with the Libson Shops loss-tracing rule. Id. at 822. National Tea cites numerous cases that state that the Libson Shops loss-tracing rule has no validity under the 1954 Code, but these cases all involve net loss carryovers, not carrybacks. Exel Corp. v. United States, 451 F.2d 80 (8th Cir.1971); United States v. Adkins-Phelps, Inc., 400 F.2d 737 (8th Cir.1968); Frederick Steel Co. v. Commissioner, 375 F.2d 351 (6th Cir.1967), certiorari denied, 389 U.S. 901, 88 S.Ct. 219, 19 L.Ed.2d 217; Maxwell Hardware v. Commissioner, 343 F.2d 713 (9th Cir.1965); Clarksdale v. Commissioner, 45 T.C. 234 (1965). Since Congress replaced Libson Shops and other judicially created schemes with its own statutory scheme for carryovers, but did not do so for carrybacks, these cases do not detract at all from our holding today.
 
 
 24
 For the above stated reasons, the decision of the Tax Court is affirmed.
 
 
 
 [1]
 The Internal Revenue Code of 1954 uses the term "carryover" to refer only to net operating losses that a corporation can carry forward to succeeding tax years. The term "carryback" refers to net operating losses that a corporation can carry back to previous tax years. The terms carryover and carryback as used in the Code are mutually exclusive. See, e.g., Sec. 172(b). Although carryforward might be a more precise term than carryover, following the convention of the Code we use the terms carryover and carryback in the same manner as the Code does. All statutory references herein are to provisions in the Code (26 U.S.C.)
 
 
 [2]
 The issue of whether the merger of two or more operating corporations is an "F" reorganization, and hence whether the acquiring corporation must follow any tracing rule when carrying back post-reorganization net operating losses against pre-reorganization income of the transferor corporation, has been answered by subsequent statutory changes. Congress has modified Section 368(a)(1)(F) so that an "F" reorganization is now defined as "a mere change in identity, form, or place of organization of one corporation." However, the change does not affect the instant case, since the new definition applies only to transactions occurring after August 31, 1982. H.R.Rep. No. 760, 97th Cong., 2d Sess., at 540-541 (1982), [1982] U.S.Code Cong. & Ad.News 781, 1314, 1315, 1982-2 C.B. 634. Nor does the change shed much light on the instant case, since the Conference agreement does not say whether this change represents a return to Congress' original intent or reflects a desire to create a new definition. See generally Bittker & Eustice, FEDERAL INCOME TAXATION OF CORPORATIONS AND SHAREHOLDERS p 14.18 (1985 Cumulative Supplement No. 1)
 Even this new version of the "F" reorganization does not answer all the questions. The Conference Report notes that the new definition "does not preclude the use of more than one entity to consummate the transaction provided only one operating company is involved." H.R.Rep. No. 760, 97th Cong., 2d Sess., at 541 (1982), [1982] U.S.Code Cong. & Ad.News 1315, quoted by Bittker & Eustice at p 14.18 (1985 Cumulative Supplement No. 1). However, if the "F" reorganization involves only one operating corporation, then the carryback of losses should not raise the complex accounting problems caused by the instant case and discussed further in section III of this opinion.
 
 
 [3]
 The merger of two corporations owned by the same shareholders can be an "A" reorganization, while the liquidation of a wholly-owned subsidiary into its parent may also be an "A" reorganization (as in the instant case), as well as being governed by Sections 332 and 334. However, neither of these tax characterizations would allow the acquiring corporation to carryback post-reorganization net operating losses to pre-reorganization income of the transferor corporation
 
 
 [4]
 This entire argument--that Congress never intended Section 381(b)(3) to allow loss carrybacks where the reorganization involved multiple operating corporations--is yet another good argument against construing Section 368(a)(1)(F) as including the merger of multiple operating corporations as an "F" reorganization. Yet, as we have noted, the Commissioner has conceded this point in Rev.Rul. 75-561, 1975-2 C.B. 129, both parties have stipulated to this point, and it is not an issue before us today
 
 
 [5]
 While the issue of whether the Libson Shops loss-tracing rule has continued validity under the 1954 Code was not fully presented in an adversarial fashion to the Fifth Circuit prior to its published opinion, this does not detract from our approval of that decision