**HOME CONSTRUCTION CORPORA-
TION OF AMERICA, a Cor-
poration, Plaintiff,**

v.

**UNITED STATES of America,
Defendant.**

Civ. A. No. 4802–67.

United States District Court,
S. D. Alabama.

Oct. 10, 1969.

Judgment Dec. 24, 1969.

Sid Williams and Jack Warren, Attys.,
Tax Division, Department of Justice,
Washington, D. C., Irwin W. Coleman,
Jr., Asst. U. S. Atty. S. D. Alabama,
Mobile, Ala., for appellant.

Charles B. Bailey, Jr. and J. Jeptha
Hill, Robert P. Denniston, Mobile, Ala.,
for appellee.

## OPINION

DANIEL HOLCOMBE THOMAS,
District Judge.

### Type Case and Issue

This is an action for the recovery of
federal income taxes brought in accord-
ance with Title 28, U.S.Code, Sec.
1346(a) (1), and there are no jurisdic-
tional defects. The plaintiff corporation
sustained tax losses for its fiscal tax
years ending in 1963 and 1964 and it
seeks in this action to carry these losses
back as net operating loss carrybacks to
be taken as deductions for earlier tax
years of certain corporations which were
merged or consolidated to form plaintiff
corporation. The determinative issue is
whether the facts here disclose a so-
called "F" type reorganization, i. e., a
corporate reorganization under and with-
in the meaning of 26 U.S.C., Sec. 368
(a) (1) (F). This devolves into two
questions, the first being whether "F"
type reorganizations include a merger or
consolidation of two or more active cor-
porations or whether such are limited to
certain changes effected with respect to
a single active corporation. Upon analy-
sis and authority the Court finds that
they are not so limited. The next ques-
tion posed is whether the facts here
come within the definition of an "F"
reorganization, i. e., whether they con-
stitute " * * * a mere change in
identity, form, or place of organization,
however effected." Upon analysis of the
facts and the meaning of the law, the
Court finds that the facts here do come
within this definition.

### Findings of Fact

In 1955 Frank H. Lee (referred to
herein as Lee) formed Lee & Pearce De-
velopment Company as an Alabama cor-
poration. Its name was changed to Lee
Development & Construction Company,
Inc., in 1956. With the exception of

nominal or qualifying shares, Lee owned all of its outstanding capital stock throughout its existence. From the time of its formation, said corporation was engaged in low-cost home construction and sales and in the related mortgage financing business. Its principal place of business was originally in Jackson, Alabama, but it moved to Mobile, Alabama, during 1961 because of expanded personnel and transportation requirements.

With the expansion of the business and commencing in about 1960, Lee formed and owned numerous additional corporations to carry on various aspects of the low-cost home business in new locations throughout the Southeast and Southwest. A number of such corporations were engaged in the distribution, storage and sale of the building materials used in the construction, which corporations were known as and are referred to herein as warehouse companies; others were engaged in house and shell home construction, being known and referred to as building companies; while others were engaged in the selling of the houses, being known and referred to as sales companies. Except for the ultimate sale of the houses to third parties, virtually no business was done by the corporations with parties other than the other corporations. The typical fact pattern followed by the three types of companies was this: A warehouse company would be located in each large geographical territory where operations were conducted; it would supply a number of building companies located within different sections of that territory; the building companies would in turn each construct houses for one or more local sales companies operating within specific localities; and, the sales companies would promote the sale of houses in their areas. Typically, a warehouse company would service several states, a construction company would serve a portion of a state or a comparable functional area, and a sales company would operate within a county, a municipality or a metropolitan area.

During this same period, Lee also organized three additional corporations: Two which were engaged in financing the ultimate buyer for the purchase of the houses constructed and sold (Lee Acceptance Corporation and International Acceptance Corporation); and, one engaged in leasing automotive vehicles and airplanes to the other Lee corporations mentioned herein (Lee Leasing Corporation). The names and states of incorporation of all these corporations were as shown on Exhibit A (as amended) which is attached to and is part of the amended joint stipulation filed by the parties in this cause. Therein the financing corporations and the leasing corporation are designated as Group "A"; two Kentucky corporations (a sales company and a building company) are designated as Group "B" for the reason mentioned, infra; and, all the other warehouse, building and sales corporations are designated as Group "C."

From the time of their creation and throughout the effective date of the reorganization (July 31, 1962), all the corporations listed in said Exhibit A to the joint stipulation except Lee Development & Construction Company, Inc., were centrally managed and their overall operations were directed by said Lee Development & Construction Company, Inc., for which it received certain fees. In furnishing the service and exercising the control incident to such corporate management, Lee Development & Construction Company, Inc., performed the following: It exercised overall control and supervision of the purchasing of raw materials, negotiated prices based on quantity purchases, and set the quality standards of building materials; it performed all the design and engineering functions for the building corporations; developed and supplied the building plans and specifications for the various models of shell homes which were being built as the main building activity; it centrally performed all the bookkeeping activities and maintained all the business books and records for the other corporations (keeping separate

books for each corporation prior to the merger); it prepared and filed all tax returns and other required reports; it held and controlled all funds, handled all collections and paid out all disbursements; it supervised personnel matters, did the hiring and firing of all middle and upper echelon employees, set compensation policies and administered personnel training; it furnished all legal services for the other corporations; it furnished all radio and other types of advertising; and, it made all such overall management decisions as when and where to locate new operations. Additionally, all the Group "B" and Group "C" corporations carried on their business, or virtually all of it, under the single trade name of "Lee Quality Homes." Examples of how they used such trade name included its display on all their public signs, on all their vehicles, on their letterhead and other business forms, its use as their name in their telephone listings and in all the advertising which was performed for them.

Lee personally was the sole proprietary owner of the capital stock of all the Lee corporations, and he personally exercised direction and control of them. He was President of all, was on the Board of Directors of all, and he directed who else should be named to all such boards and who should serve as officers. Mr. Sidney M. Harrell was Secretary of all the corporations and performed the legal work for the formation of all (except the first one, in 1955), he was on the payroll as an employee of Lee Development & Construction Company, Inc., and performed in effect the role of "House Counsel" for all the corporations. All the Boards of Directors consisted of Frank Lee, Sidney M. Harrell, Mrs. Frank Lee and in one or two instances one or two others from among a small group of Frank Lee's key personnel. In practice all management level decisions were made by Frank Lee personally, and the directors' meetings of the various corporations were highly informal and no formal votes were taken at them.

The facts as outlined hereinabove are found to be true at all times prior to the reorganization and pertinent to this case. They were true regarding each corporation from its organization through the years to which the net operating losses are sought to be carried back in this action, and until the corporate reorganization took place.

Prior to the merger, in connection with his efforts to get substantial long-range financing for the Lee corporations, Lee contacted The Citizens & Southern National Bank, Atlanta, Georgia. Early in 1962, as a condition to its participating in such financing, said Bank required that the warehouse, building and sales corporations be unified into one corporation. While Lee and other corporate personnel knew that there might be other advantages to such a consolidation, the primary reason for the consolidation which occurred, the efficient and dominating reason for it, was the fact that The Citizens & Southern National Bank required it as a condition to its extending the needed credit.

At the time such decision was made and when the reorganization was carried out, it was expected by Lee, the Lee corporations and The Citizens & Southern National Bank that the future operations of the enterprise would be profitable.

The plan adopted to achieve such unification was as follows: Frank H. Lee would transfer to Lee Development & Construction Company, Inc. (his wholly owned corporation), all the outstanding capital stock of each of the other Lee corporations, which he owned; then Lee Development & Construction Company, Inc., (which was an Alabama corporation) would create a new Delaware subsidiary corporation with a minimum initial capitalization (to be known as Lee Quality Homes Corporation) and Lee Development & Construction Company, Inc., would be merged into the new corporation, as would all the other corporations except the financing and leasing corporations which would be continued as subsidiaries of Lee Quality Homes

Corporation. All the business operations formerly carried on through separate wholly owned corporations would be carried on by one wholly owned corporation with the financing and leasing subsidiaries mentioned above. The above plan was executed. A minor alteration was made necessary by the fact that the laws of Kentucky did not allow Kentucky corporations to be merged into foreign corporations, the two Kentucky corporations involved (Group "B" on Exhibit A to the joint stipulation) were dissolved by Lee Quality Homes Corporation. In the execution of the plan, on May 31, 1962, the stock of all the corporations (Group "C" on such Exhibit A) except Lee Development & Construction Company, Inc., was transferred by Frank H. Lee to Lee Development & Construction Company, Inc. In accordance with the plan, on July 13, 1962, Lee Development & Construction Company, Inc., organized and acquired all the capital stock of Lee Quality Homes Corporation, a Delaware corporation. On that same date said new and old corporations adopted a formal written Plan of Reorganization and each of the other Group "C" corporations adopted the same plan of reorganization by appropriate corporate action. A true copy of said written plan is attached to the joint stipulation of the parties as Exhibit C. Pursuant to the plan, Lee Development & Construction Company, Inc., and all its assets were merged into Lee Quality Homes Corporation on July 19, 1962. Also pursuant to the plan, all the said Group "C" corporations were merged into Lee Quality Homes Corporation on July 31, 1962. These mergers were all accomplished pursuant to the statutes of the various states involved and the requirements of said statutes were complied with and met. Under the plan the reorganization was all made legally effective as of July 31, 1962. On that date the two Kentucky corporations referred to above were liquidated under state law into Lee Quality Homes Corporation.

Following the reorganization outlined above and at all times pertinent to this case, all the business activities which had been carried on by the separate Group "C" corporations before the reorganization were carried on by the unified corporation, the plaintiff. The former corporations were then operated as branches. Until after the tax years in which occurred the net operating losses, the only changes made in the corporate activities conducted were those currently dictated by the business operations. No changes took place which had any connection with the corporate reorganization. Neither at the time of the merger nor in connection with the merger were there any changes in the scope or the type of the overall business operations which were carried on, nor in the business locations, nor in the location of the managing headquarters, nor were there any changes in the overall corporate assets, in the personnel employed in the operations, or in the methods of operations (except for certain simplifying of the bookkeeping requirements, such as the use of a single balance sheet rather than separate ones). From the period from the reorganization through the tax years of the net operating losses the plaintiff corporation continued to furnish to all the continuing business branches or locations the same type and extent of management services which Lee Development & Construction Company, Inc., had furnished before the reorganization. Frank Lee continued to own all the stock and to exercise personal control and direction the same as before the merger. He continued to be President and Managing Director of the plaintiff corporation, and the same persons who constituted or controlled the Boards of Directors of the former corporations constituted the board of the continuing corporation. Sidney M. Harrell was the Secretary of the continuing corporation, and the other officers were the same as the pattern followed by the multiple corporations before the reorganization. Plaintiff continued to do all the same business under the trade name "Lee Quality Homes" as had been done before the reorganization.

In essence the change resulting from the reorganization was merely a change in the legal form in which the business was conducted; namely, the operations of the warehouse, building and sales companies which had been carried on through separate corporate entities were thereafter carried on within one corporate entity. There was no change in proprietary ownership which was vested in Lee at all times, and no change in any aspect of the substance of the business. The change was limited to change in the form, along with change in the name and place of incorporation.

The various corporations merged into Lee Quality Homes Corporation had previously operated on diverse fiscal years for reporting their federal income taxes. Upon the merger, each which was not already on a July 31st fiscal year closed its taxable year as of July 31, 1962, so as to conform to the same tax year adopted by Lee Quality Homes Corporation,

On April 3, 1964, Lee Quality Homes Corporation filed with the appropriate office of the State of Delaware a Certificate of Amendment to its Certificate of Incorporation by which the legal name of the corporation was changed to Home Construction Corporation of America. Home Construction Corporation of America, the plaintiff herein, is the same corporation by a different legal name as that referred to above as Lee Quality Homes Corporation.

For federal income tax purposes, Lee Quality Homes Corporation reported its income on a fiscal year basis ending July 31st. For its tax year ending July 31, 1963, said corporation sustained and reported net operating losses in the amount of $1,084,483.06, and for its tax year ending July 31, 1964, it sustained and reported net operating losses in the amount of $626,374.62.

Certain of the corporations which were merged into plaintiff corporation had received taxable income for the particular fiscal years and in the specific amounts as shown on Exhibit B attached to and comprising part of the joint stipulation. Subject to the exceptions mentioned below, the parties have stipulated that the taxes, recovery of which is sought in this case, were paid by the constituent corporations as shown in Exhibit B to the joint stipulation and that, if plaintiff is entitled to recover in this cause, it would be entitled to recover the specific principal sums listed in Column G of said joint stipulation. Except as to the items to be specially treated as mentioned below, it is hereby found that plaintiff shall be entitled to recover such amounts as are listed in said Column G under the judgment to be entered in this cause. As to the specific Column G refund claim amounts listed below, the parties have not stipulated that same have been paid, and they are referred to hereinafter in this opinion as the "excepted amounts." Same are:

| Claim No. | | Company | Fiscal Year Ending | Amount Claimed |
|---|---|---|---|---|
| (a) | 45 | Magnolia Sales, Inc. | 1–31–61 | $ 6,511.35 |
| (b) | 40 | Lee Quality Homes | 8–31–60 | $11,797.54 |
| (c) | 38 | Lee Homes | 8–31–60 | $ 4,835.60 |
| (d) | 43 | Macon Building Company | 4–30–62 | $ 723.40 |
| (e) | 4 | Bel-Air Sales Corporation | 4–30–61 | $ 9,963.77 |
| (e 2nd) | 5 | Bel-Air Sales Corporation | 4–30–62 | $ 4,471.45 |
| (f) | 48 | Mid-South Supply Company | 8–31–60 | $ 7,203.35 |
| (g) | 8 | Bogalusa Sales Company | 7–31–62 | $ 2.10 |
| (h) | 73 | Tri-Cities Supply Company | 7–31–62 | $ 11.10 |
| (i) | 70 | Tideland Supply Company | 5–31–61 | $ 6,185.70 |
| (j) | 66 | Southeastern Sales Company | 4–30–61 | $ 7,882.67 |
| (j 2nd) | 67 | Southeastern Sales Company | 4–30–62 | $ 4,592.35 |

*Conclusions of Law*

The issue before the Court for decision is whether net operating losses, under 26 U.S.C. Sec. 172, sustained by the plaintiff corporation, can be carried back and taken as deductions for earlier tax years of certain of the corporations which were merged into the plaintiff corporation. If the merger was a reorganization within the meaning of 26 U.S.C. Sec. 368(a) (1) (F), then 26 U.S.C. Sec. 381(b) permits such net operating losses to be carried back.

The plaintiff takes the position that the merger is a "mere change in identity, form or place of organization", under 26 U.S.C. Sec. 368(a) (1) (F) as well as a "statutory merger" under 26 U.S.C. Sec. 368(a) (1) (A) and that the net operating loss carrybacks are allowed under 26 U.S.C. Sec. 381 in accordance with 26 U.S.C. Sec. 172. It is the defendant's contention that the merger was a reorganization under the provisions of 26 U.S.C. Sec. 368(a) (1) (A) but not under Sec. 368(a) (1) (F), and that such net operating loss carrybacks are therefore not allowed by 26 U.S.C. Sec. 381 and Treas.Reg. Sec. 381(c) (1)–1(b), example 2.

The pertinent provisions of the Internal Revenue Code which relate to the issue are 26 U.S.C. Sec. 172, which defines and allows carryover and carryback net operating loss deductions; 26 U.S.C. Sec. 381, relating to carryovers and carrybacks in certain corporate acquisitions; and 26 U.S.C. Sec. 368, definitions relating to corporate reorganizations.

The "F" reorganization provision has received scant attention until recent years even though it has been in effect since its enactment as Section 202(c) (2) of the Revenue Act of 1921. However, it is well established that an "F" type reorganization transcends all other forms of reorganization defined in 26 U.S.C. Sec. 368(a) (1). See Rev. Rul. 57–276, 1957–1 C.B. 126 where the Commissioner ruled that if a reorganization met the requirements of Section 368(a) (1) (F) even though it also qualified under one or more of the other definitions of Section 368(a) (1), it would be an "F" type reorganization. This is further confirmed by Treas.Reg. Sec. 1.381(b)–1(a) (2) where it is stated:

> In the case of a reorganization qualifying under section 368(a) (1) (F) *(whether or not such reorganization also qualifies under any other provision of section 368(a) (1))* the acquiring corporation shall be treated (for purposes of section 381) just as the transferor corporation would have been treated if there had been no reorganization. * * *

Thus, even though the merger here is a "statutory merger" type reorganization within the meaning of Section 368(a) (1) (A), if it is likewise an "F" type reorganization within the meaning of Section 368(a) (1) (F), the latter will control.

Essentially, the question for decision, in the factual context of this case is this: Does a reorganization involving a statutory merger of functionally related corporations which comprise integral parts of a unified and centrally managed and controlled over-all business enterprise into a single corporation with no change in stockholders or their proprietary interests, no change in the ownership, form or location of the corporate assets, no change in the corporate personnel or management, and no change in the type, scope and method of business operations, constitute a "mere change in identity, form or place of organization"? Secondly, does it make any difference whether the merger be treated as one simultaneous merger of 123 corporations into one or 123 separate but contemporaneous mergers of each of the 123 constituent corporations into one.

The Fifth Circuit's well reasoned decision of Davant v. Commissioner of Internal Revenue, 366 F.2d 874 (1966) cert. den. 386 U.S. 1022, 87 S.Ct. 1370, 18 L.Ed.2d 460, and Stauffer's Estate v. Commissioner of Internal Revenue, 403 F.2d 611 (1968) and Associated Machine

v. Commissioner of Internal Revenue, 403 F.2d 622 (1968), both decided by the Ninth Circuit, are controlling here. The Davant case involved two active brother-sister corporations ("Water" and "Warehouse"). A reorganization carried out by the merger of these two corporations in which there was no change in ownership, but a distribution of $900,000 cash to the shareholders, was held to be an "F" type reorganization for the reason that Section 368(a) (1) (F) "obviously refers to a situation which represents a mere change in form as opposed to a change in substance * * * where the corporate enterprise continues uninterrupted" and "there is a complete identity of shareholders and their proprietary interests". The Court then went on to hold:

> A Section 368(a) (1) (F) reorganization is defined as a "mere change in identity, form or place of organization, however effected" * * * In the past, type (F) reorganizations have overlapped with type (A), (C) and (D) reorganizations. For this reason, this provision has received almost no administrative or judicial attention. It is true that a substantial shift in the proprietary interest in a corporation accompanying a reorganization can hardly be characterized as a mere change in identity or form * * *
>
> The term "mere change in identity [or] form" obviously refers to a situation where it represents a mere change in *form* as opposed to a change in substance   Whatever the outer limits of Section 368(a) (1) (F), it can clearly be applied where the corporate enterprise continues uninterrupted, except for a distribution of some liquid assets or cash. Under such circumstances, there is a change of corporate vehicles but not a change in substance. If Water had no assets of its own prior to the transfer of Warehouse's operating assets to it, could we say that Water was any more than the alter ego of Warehouse? The answer is no. The fact that

Water already had other assets that were vertically integrated with Warehouse's assets does not change the fact that Water was Warehouse's alter ego. Viewed in this way, it can make no practical difference whether the operating assets were held by Water or Warehouse, and a shift between them is a mere change in identity or form. At least where there is a complete *identity of shareholders and their proprietary interests*, as here, we hold that the type of transaction involved is a type (F) reorganization.

The corporate enterprise, the building and sale of low-cost homes and shell homes, which was carried on under the name and style of Lee Quality Homes was not interrupted, apparently even in the slightest, by the merger or mergers which took place in July of 1962. It is undisputed that there was no change in the identity of the shareholders and the proprietary interests, since Frank H. Lee was in effect the sole shareholder both before and after the merger. Furthermore, there was not even a change in the ownership of any of the assets of the corporations as there was in the Davant case when some $900,000 in cash was distributed. The plaintiff corporation had no assets other than those which it acquired from the constituent corporations. The facts here present an even clearer manifestation of a "mere change in form or identity" than in the Davant case itself.

Except for the number of corporate entities involved, the Stauffer case is essentially indistinguishable from this one, and this is, in the Court's opinion, simply a difference in degree of "form". The defendant argues that "F" type reorganizations should be restricted to those involving just one active corporation, not multiple active corporations. Its rationale would apply with equal force against an "F" type reorganization of two active corporations as of any larger number. That rationale has been rejected by the Fifth and Ninth Circuits.

In the Stauffer case, the Ninth Circuit held:

> In the instant case, the only change that took place was that Stauffer New Mexico [the transferee corporation] reported the combined income of the three pre-merger corporations in one tax return; the individual books of the constituent enterprises were kept as they had been before the merger; the enterprises continued to operate in the same manner and in the same location as before the merger; the change was one of corporate vehicles only. The Regulations, § 1.381(b)–1 (a) (2), state that in an "F" reorganization the acquiring corporation is to be treated "just as the transferor corporation would have been treated if there had been no reorganization." Thus, the identity of pre- and post-merger entities is so complete that for tax purposes the latter is the former. That Stauffer New Mexico stood in the shoes of each of the three constituent corporations cannot be here denied; it was the alter ego of each of the three pre-merger entities.

The same is true here, the only change that took place was that the plaintiff corporation reported the combined income of the 123 pre-merger corporations in one tax return; there was no material change in the bookkeeping operations; the entire enterprise continued to operate in the same manner and at the same locations as before the merger; and thus the change was one of corporate vehicles only, with "the identity of the pre- and post-merger entities being so complete that for tax purposes the latter is the former."

The defendant does not favor either the Davant case or the Stauffer case and attacks the holdings in both cases vigorously. The Commissioner attacked the Davant case in his argument to the Ninth Circuit in the Stauffer case. The Commissioner there said *"Davant* was in an entirely different context than this case. Section 381 was not before the Fifth Circuit and, unfortunately, the legislative evidence presented to the Tax Court and this court was not presented to it." The Ninth Circuit went on to state in effect that they were not "persuaded that a different result should have been obtained in *Davant* because of the 'legislative evidence' which was not presented to that court but which is before us", holding:

> The principle we derive from *Davant* is that a shift in operating assets from the transferor corporation to its alter ego wherein the identity of the proprietary interest remains intact and the business enterprise of the transferor corporation continues unimpaired results in an "F" reorganization. There is a change of corporate vehicles but not a change in the substance of the transferor corporation.

This is the principle that this court derives from Davant and which it finds is controlling in this case.

The defendant devotes a substantial portion of its brief to "legislative evidence" and argues very strenuously that such "legislative evidence" dictates a result here contrary to both the Davant and the Stauffer cases.

The "legislative evidence" and the congressional intent so vigorously argued by the defendant relates to Section 381 which was first enacted in the 1954 Internal Revenue Code. This "legislative evidence" and the congressional intent reportedly expressed therein are relied upon by the defendant in contending for a restrictive interpretation of Section 368(a) (1) (F), and a holding by this court contrary to Davant and Stauffer. An anomaly here arises in that the provision which is now Section 368(a) (1) (F) has been in the Internal Revenue Code since 1921 and Section 381 was first enacted in the 1954 Internal Revenue Code. Furthermore, the avowed congressional intent in enacting Section 381 was apparently to liberalize carryovers and carrybacks and not to restrict them. In Senate Finance Committee Report, Number 1622, 83rd Congress, 2nd Session, page 52 (3 U.S.C.

Cong. and Adm.News (1954), page 4621, at pages 4683–4684) it is stated:

> Present practice rests on court-made law which is uncertain and frequently contradictory. Your committee agrees that whether or not the items carry-over should be based upon economic realities rather than upon such artificialities as the legal form of the reorganization.
>
> The bill provides for the carryover of these tax attributes or items from one corporation to another in certain tax-free liquidations and reorganizations. Under this provision, a corporation which acquires substantially all the property of another corporation in a tax-free distribution or transfer is to take into its accounts the specified items of the distributor or transferor corporation. The section does not apply in the case of split-ups, spin-offs, or other divisive reorganizations.
>
> The new rules enable the successor corporation to step into the "tax shoes" of its predecessor corporation without necessarily conforming to artificial legal requirements which now exist under court-made law. Tax results of liquidations or reorganizations are thereby made to depend less upon the form of the transaction than upon the economic integration of two or more separate businesses into a unified business enterprise * * *.

Much of defendant's attack against the Stauffer and Davant cases depends upon the defendant's apparent misinterpretation of the "continuity of business" (along with continuity of proprietary interest) test as applied by the Fifth and Ninth Circuits and relied upon by plaintiff as one of the criteria for an "F" type reorganization. Defendant would equate the meaning to nothing more than continued ownership of the business assets in corporate solution. This wholly misses the point of whether the substance of the business enterprise has been continued—which is the cogent inquiry. If the change in the form (the corporate structure) is not accompanied by any change in the substance of the business enterprise carried on before and after the reorganization, there has been a mere change in form. There might be some elimination of assets and yet be continuation of the substance of the business and hence an "F" type reorganization. On the other hand, a reorganization of the corporate structure in which all the assets continued in corporate solution might be accompanied by so much change in the method, type or quantum of the business enterprise conducted that such changes of substance would have occurred that would preclude the finding of an "F" reorganization. In this case, it is clear that there was no change of substance whatsoever.

The plaintiff has made the alternative contention that if the defendant's argument that "F" reorganizations are limited to uni-corporate transactions, or at most between two corporations when one is an active corporation and the other merely a shell receiver, then the merger here could be treated as a contemporaneous merger of the 123 constituent corporations into Lee Quality Homes Corporation the shell receiver. There is nothing before the Court to indicate why there could not have been 123 separate "changes in identity, form or place of organization however effected" when, as here, the requirements of continuity of ownership and corporate enterprise were maintained.

The Tax Court, in the Stauffer case, rejected the argument that there were three separate "F" reorganizations for reasons which would not be applicable here. The Tax Court held (48 T.C. 277, 303–304):

> The merger agreement specifically stated that it would not be binding upon any of the constituent corporations, their officers, or stockholders until a copy of the agreement and any other certificate and documents required by law were properly filed and recorded with the proper governmental authority of all four States. Even if Stauffer California complied with

the laws of its jurisdiction before Stauffer Illinois and Stauffer New York did so, a finding we cannot make on the state of this record, by the terms of the merger agreement there was no valid merger between any of the corporations until the laws of all the States involved had been complied with. Thus, the three old Stauffer companies merged into Stauffer New Mexico not *seriatim* but simultaneously. Either all three were parties to the (F) reorganization or none were. The three mergers were interdependent. They cannot be fragmented, nor can one of them be singled out as an (F) reorganization as was possible in the case of the parent corporation in Rev.Rul. 58–422.

The merger agreement between Lee Quality Homes Corporation and the others provided:

10. For all purposes not in conflict with any law to the contrary, the mergers and dissolutions provided herein shall be effective as of the close of business on July 31, 1962, provided that nothing in this sentence shall affect the validity of any documents or reports filed with any governmental agency in advance of or subsequent to that date and intended to carry to a speedy conclusion the mergers and dissolutions contemplated hereby. All assets and liabilities and corporate business of all of the other corporate parties hereto shall be transferred to and assumed by said Lee Quality Homes Corporation as of said date and time and the separate corporate business of all of said other corporate parties hereto, respectively, shall cease as of said date and time even if the merger or dissolution thereof has not been then legally concluded. If any one or more of the mergers, dissolutions or transfers herein contemplated is found to be invalid or otherwise incapable of accomplishment in accordance with the provisions hereof, such shall not render invalid or unenforceable the remaining mergers, dissolutions or transfers

herein contemplated. (Stipulation Exhibit E)

The consolidation here could well be viewed as 123 contemporaneous but separate mergers of each transferor corporation into the plaintiff corporation.

Whether viewed as one simultaneous merger or 123 contemporaneous mergers, there was a mere change in corporate structure or form with no change in substance.

Plaintiff is entitled to judgment in accordance with this opinion. It is hereby ordered and adjudged that such judgment shall be entered for the amounts set out in Column G of the joint stipulation filed by the parties in this case, other than the "excepted amounts", and for such portion of such "excepted amounts", if any, as the parties shall stipulate in accordance with paragraph numbered 19 of the joint stipulation, with interest thereon as provided by law. It is hereby ordered that the parties shall within thirty days of the filing of this opinion file with the Court any such stipulation or stipulations. If such a stipulation is not filed within such period, the Court, or Special Master if one is appointed, shall hear further evidence and make its determination of what additional sums, if any, plaintiff is entitled to recover. The final money judgment in this cause shall be entered by the Court upon the filing of such stipulation or when such independent determination has been made by the Court.

## JUDGMENT

In conformity with the Opinion containing the Findings of Fact and Conclusions of Law of the Court filed on October 10, 1969, and the Supplemental Stipulation with Respect to 'Excepted Amounts" filed in this cause on December 24, 1969,

It is hereby ordered, adjudged and decreed by the Court that the Plaintiff have and recover $288,730.98 with interest as prescribed by law of the Defendant, and that costs of Court herein be and are taxed against the Defendant.