NATIONAL TEA CO. AND CONSOLIDATED SUBSIDIARIES, AS SUCCESSOR TO NATIONAL SUPERMARKETS, INC., FORMERLY NATIONAL FOOD STORES OF LOUISIANA, INC., PETITIONER *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 31558–81.      Filed July 11, 1984.

*Arthur S. Rollin* and *Thomas C. Durham*, for the petitioner.
*Carleton E. Knechtel* and *John J. Morrison*, for the respondent.

JACOBS, *Judge*:* Respondent determined deficiencies in income tax and transferee liabilities against petitioner as successor in interest to, and as transferee of the assets of, National Supermarkets, Inc., formerly National Food Stores of Louisiana, Inc. (hereinafter referred to as Supermarkets) for the taxable years ended March 29, 1969, and April 1, 1972, as follows:

| TYE | Deficiency |
| --- | --- |
| Mar. 29, 1969 | $39,651 |
| Apr. 1, 1972 | 1,546,681 |

The sole issue for decision is whether, following a reorganization described in section 368(a)(1)(F),[1] a net operating loss of the acquiring corporation (petitioner) which occurred in the taxable year of the reorganization (1974) may be carried back under section 381(b)(3) to a pre-reorganization taxable year (1972) of the transferor corporation (Supermarkets) where no portion of such loss is attributable to the business formerly operated by the transferor corporation.

## FINDINGS OF FACT

The facts of this case have been fully stipulated and are so found.

---

*By order of the Chief Judge, this case was reassigned from Judge Darrell D. Wiles to Judge Julian I. Jacobs for disposition.

[1] All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

Petitioner National Tea Co. (hereinafter referred to as National Tea) is an Illinois corporation organized in 1902. At the time of the filing of the petition herein, National Tea's principal office was located in Rosemont, IL. National Tea and its subsidiaries operate a chain of retail food stores in various geographical areas of the United States. On December 28, 1974, National Tea and its subsidiaries operated 484 stores in 13 states.

Supermarkets, a Louisiana corporation, was formed on October 23, 1929. It operated a chain of retail food stores in and around New Orleans, LA. As of December 26, 1974, Supermarkets operated 57 stores.

In 1954, National Tea acquired by purchase approximately 98 percent of the outstanding stock of Supermarkets.[2] Over the years, National Tea acquired additional stock so that by December 26, 1974, National Tea owned 99.98 percent of the outstanding stock of Supermarkets.[3]

On November 26, 1974, a plan, entitled "Plan of 'F' Reorganization and Merger" (the merger agreement), to merge

---

[2] In 1954, Supermarkets' corporate name was Capitol Stores, Inc. At some time prior to Mar. 11, 1955, the name of Capitol Stores, Inc., was changed to National Food Stores of Louisiana, Inc.; and on Nov. 30, 1972, the name of the corporation was changed to National Supermarkets of Louisiana, Inc.

[3] National Tea's ownership of the stock of Supermarkets, from Dec. 31, 1955 to Dec. 26, 1974, was as follows:

| Date | Number of shares owned by National Tea | Percentage of outstanding shares owned by National Tea |
|---|---|---|
| 12/31/55 | 166,634 | 99.30% |
| 12/31/56 | 166,756 | 99.37 |
| 12/31/57 | 166,819 | 99.41 |
| 12/31/58 | 167,313 | 99.70 |
| 12/31/59 | 167,676 | 99.92 |
| 12/31/60 | 167,713 | 99.94 |
| 12/31/61 | 167,734 | 99.95 |
| 03/07/62 | 167,734 | 99.95 |
| 03/07/63 | 167,775 | 99.98 |
| 03/06/64 | 167,775 | 99.98 |
| 03/08/65 | 167,775 | 99.98 |
| 03/07/66 | 167,775 | 99.98 |
| 03/07/67 | 167,775 | 99.98 |
| 03/07/68 | 167,775 | 99.98 |
| 06/25/69 | 167,775 | 99.98 |
| 06/24/70 | 167,775 | 99.98 |
| 06/23/71 | 167,775 | 99.98 |
| 06/28/72 | 167,775 | 99.98 |
| 11/30/72 | 167,777 | 99.98 |
| 12/26/74 | 167,777 | 99.98 |

Supermarkets with and into National Tea was adopted. The stated purpose of the merger was to simplify the structure of National Tea and to provide a savings in certain State franchise and income taxes. The merger was effectuated under the applicable short-form Merger Statutes of Illinois and Louisiana, and became effective as of the close of business on December 26, 1974. Supermarkets' shareholders, other than National Tea, received cash in exchange for their aggregate 0.02-percent interest.

Under the merger agreement, National Tea agreed to assume all liabilities and obligations of Supermarkets. On December 26, 1974, Supermarkets transferred all of its assets to National Tea in accordance with the merger agreement; and thereupon its separate corporate existence ceased, except to the extent provided by the laws of the State of Louisiana.

Prior to the merger of Supermarkets into National Tea, both corporations were engaged in the same primary business activity of operating retail food stores. Following the merger, National Tea's business activity and the business activity previously carried on by Supermarkets continued substantially unchanged.

As of December 26, 1974, National Tea operated through regional organizations located in New Orleans, Chicago, Indianapolis, Minneapolis, St. Louis, Denver, and Davenport, IA. Some of these regional organizations were unincorporated divisions while others were separately incorporated subsidiaries. All of these regional organizations operated as part of National Tea's integrated retail marketing operation. This integrated retail marketing operation was controlled by, and subject to, the centralized management of the board of directors and officers of National Tea.

Prior to December 26, 1974, the assets of the New Orleans regional organization of National Tea's integrated retail marketing operations were owned by Supermarkets. Subsequent to the merger of Supermarkets and National Tea, these assets were owned by National Tea. Both prior and subsequent to the merger, the retail marketing operations in New Orleans were ultimately controlled by, and subject to, the centralized management of the board of directors and officers of National Tea.

Prior to its taxable year ending March 31, 1973, National Tea and its affiliated subsidiaries filed separate Federal

income tax returns. Beginning with the taxable year ending March 31, 1973, consolidated returns were filed. Effective December 29, 1973, National Tea changed its accounting period from a 52- to 53-week taxable year ending on the Saturday nearest March 31 to a 52- to 53-week taxable year ending on the Saturday nearest December 31.

For the taxable year ending December 28, 1974, National Tea and its affiliated subsidiaries reported a loss of $3,629,943 for Federal income tax purposes, $3,304,858 of which represented a net operating loss subject to section 172. No portion of that loss was attributable to the New Orleans regional organization, which had been operated by Supermarkets prior to December 26, 1974, and by National Tea thereafter.[4]

National Tea, as successor to Supermarkets, sought, and was granted, (1) a tentative income tax refund of $1,546,681 for Supermarkets' taxable year ending April 1, 1972 (based upon a claimed net operating loss carryback in the amount of $3,304,858 from the consolidated return of National Tea and its affiliates for the taxable year ending December 28, 1974), and (2) a tentative income tax refund of $39,651 for Supermarkets' taxable year ending March 29, 1969 (based upon a claimed carryback of an unused investment tax credit for Supermarkets' taxable year ending March 29, 1969, that arose

---

[4]The following is a summary of the income, expenses, and deductions of the business of the New Orleans regional organization of National Tea for the taxable year ending Dec. 28, 1974 (as computed under sec. 1.1502–12, Income Tax Regs.):

*Income*

| | | |
|---|---:|---:|
| Gross sales | $174,296,419 | |
| Less: Cost of goods | 137,859,764 | |
| Gross profit | | $36,436,655 |
| Interest | | 60 |
| Gross rents | | 34,999 |
| Other income | | 1,475,430 |
| Total income | | 37,947,144 |

*Expenses and deductions*

| | | |
|---|---:|---:|
| Salaries and wages | 19,484,985 | |
| Repairs | 1,175,959 | |
| Rents | 2,550,730 | |
| Taxes | 2,177,653 | |
| Depreciation | 1,655,064 | |
| Advertising | 1,207,651 | |
| Pension, profit sharing | 7,394 | |
| Employee benefit program | 1,426,857 | |
| Other deductions | 6,430,130 | |
| Total expenses and deductions | | 36,116,423 |
| Taxable income | | 1,830,721 |

from the claimed carryback of the 1974 net operating loss to Supermarkets' taxable year ending April 1, 1972). Thereafter, respondent determined that petitioner could not properly carry back its 1974 net operating loss to Supermarkets' taxable year ended April 1, 1972, and asserted deficiencies for Supermarkets' taxable years ended April 1, 1972, and March 29, 1969.

## OPINION

The case before us, involving as it does the fusion of two operating companies, is an unfortunate by-product of the judicial expansion of the category of reorganization transactions that constitutes "a mere change in identity, form, or place of organization" for purposes of section 368(a)(1)(F) (hereinafter referred to as an F reorganization). Although Congress recently amended section 368(a)(1)(F) to provide that an F reorganization embraces only those corporate adjustments involving a single operating company (H. Rept. 97–760 (Part 2), at 540–541 (1982), 1982–2 C.B. 634), this clarifying amendment is only effective as to transactions occurring after August 31, 1982 (Pub. L. 97–248, sec. 225(b), 96 Stat. 490). Therefore, the statutory amendment does not apply to the instant controversy.

The starting point for our analysis is section 381. Section 381 governs the carryover of tax attributes in connection with certain reorganizations and acquisitions, including an F reorganization. The "operating rules" set forth in section 381(b) impose certain limitations upon the extent to which a successor corporation steps into the "tax shoes" of its predecessor. The limitation relevant to the present controversy is the prohibition of section 381(b)(3)[5] against the carryback of post-reorganization losses to a pre-reorganization year of the

---

[5]Sec. 381(b)(3) provides as follows:

SEC. 381(b). OPERATING RULES.—Except in the case of an acquisition in connection with a reorganization described in subparagraph (F) of section 368(a)(1)—

\* \* \* \* \* \* \*

(3) The corporation acquiring property in a distribution or transfer described in subsection (a) shall not be entitled to carry back a net operating loss or a net capital loss for a taxable year ending after the date of distribution or transfer to a taxable year of the distributor or transferor corporation.

transferor corporation. This prohibition, however, does not apply to an F reorganization.

Although the scope of section 368(a)(1)(F) at one time was considered extremely narrow and only applicable to minor corporate adjustments involving one operating company, the definition of an F reorganization was judicially expanded through the course of extensive litigation to include mergers of two or more operating companies.[6] *Estate of Stauffer v. Commissioner*, 403 F.2d 611 (9th Cir. 1968), revg. 48 T.C. 277 (1967); *Associated Machine, Inc. v. Commissioner*, 403 F.2d 622 (9th Cir. 1968), revg. 48 T.C. 318 (1967); *Home Construction Corp. of America v. United States*, 439 F.2d 1165 (5th Cir. 1971); *Performance Systems, Inc. v. United States*, 382 F. Supp. 525 (M. D. Tenn. 1973), affd. per curiam 501 F.2d 1338 (6th Cir. 1974); *Movielab, Inc. v. United States*, 204 Ct. Cl. 6, 494 F.2d 693 (1974). Confronted with so many adverse decisions, respondent acquiesced in the judicial enlargement of the scope of section 368(a)(1)(F) in Rev. Rul. 75–561, 1975–2 C.B. 129.[7]

Consistent with his position in Rev. Rul. 75–561, respondent has conceded that the merger of Supermarkets into National Tea qualifies as an F reorganization. However, Rev. Rul. 75–561, while adopting the expanded definition of an F reorganization, limits the availability of a carryback of a post-

---

[6]We have on several occasions reviewed those portions of the legislative history of the 1954 Code that, in our view, clearly demonstrate that Congress never intended that a combination of two or more operating companies should qualify as a reorganization under sec. 368(a)(1)(F). *Estate of Stauffer v. Commissioner*, 48 T.C. 277, 299–302 (1967); *Associated Machine, Inc. v. Commissioner*, 48 T.C. 318, 328 (1967); *Romy Hammes, Inc. v. Commissioner*, 68 T.C. 900, 906 n. 8, 908 (1977). Although we see no useful purpose served by reiterating our prior discussions here, we do note that the legislative history to the recent clarifying amendment to sec. 368(a)(1)(F), which was added to the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97–248, sec. 225(a), 96 Stat. 490, corroborates our view that multicorporate reorganizations were not intended to fit within the definition of an F reorganization. H. Rept. 97–760 (Part 2), at 540–541 (1982), 1982–2 C.B. 634.

[7]Rev. Rul. 75–561 sets forth respondent's criteria for the qualification of a multicorporate merger as an F reorganization, all of which respondent concedes have been satisfied in the present case.

The ruling provides that a fusion of two or more operating corporations will be treated as a reorganization under sec. 368(a)(1)(F), if the following criteria are met:

(1) There must be complete identity of shareholders and their proprietary interests in the transferor corporation and acquiring corporation;

(2) The transferor corporation and the acquiring corporation must be engaged in the same business activities or integrated activities before the combination; and

(3) The business enterprise of the transferor corporation and the acquiring corporation must continue unchanged after the combination.

Rev. Rul. 75–561 has been amplified by Rev. Rul. 78–287, 1978–2 C.B. 146, and modified by Rev. Rul. 78–441, 1978–2 C.B. 152.

reorganization net operating loss to a pre-reorganization year of the transferor corporation to those instances where the loss in question was generated by "a separate business unit or division formerly operated by the transferor corporation"[8] (hereinafter referred to as the loss-tracing requirement). In the present case, no part of the 1974 net operating loss of the consolidated group was attributable to the business formerly operated by Supermarkets. Respondent therefore disallowed the petitioner's claimed carryback of the loss to Supermarkets' pre-merger taxable year ended April 1, 1972.

Given respondent's concession that the merger of Supermarkets into petitioner qualifies as an F reorganization, petitioner contends that the carryback of the 1974 loss to Supermarkets' taxable year ended April 1, 1972, is authorized by the express language of section 381(b)(3). Specifically, petitioner argues that, because the merger of Supermarkets and National Tea qualifies as an F reorganization, such a reorganization is excepted from the prohibition against a net operating loss carryback (as set forth in section 381(b)(3)) and therefore it has the right to carry back its post-merger net operating loss to a pre-merger taxable year of Supermarkets. Indeed, petitioner asserts that section 381(b)(3) "provides a simple, straightforward, and unambiguous method for handling post-"F'" reorganization losses." We do not accept petitioner's reading of the statute.

Section 381(b)(3) does not provide a positive grant of authority for a carryback of post-merger net operating losses to pre-merger years, nor does it prescribe any method for the "handling" of post-F reorganization losses. Rather, the provision simply poses a limitation on the transfer of a net operating loss between consolidating corporations by generally proscribing carrybacks by the acquiring corporation to the transferor corporation's pre-reorganization years, except in the case of F reorganizations. The exception for F reorganizations from the loss carryback limitation is left otherwise undefined by the statute. Thus, the real question here is whether respondent's loss-tracing requirement, adopted in Rev. Rul. 75–561 as a condition to the allowability of a loss

[8]Rev. Rul. 75–561 also requires that the transferor corporation must have income in its pre-reorganization year against which the loss can be offset. In this case, this requirement has been satisfied.

carryback in connection with an F reorganization, properly describes the parameters of the exception. For the reasons set forth below, we conclude that such a loss-tracing requirement is proper.

First, we find support for respondent's loss-tracing requirement in the legislative history of section 381. Section 381 was first enacted as part of the 1954 Code. The House version of section 381(b) permitted no exception to the general prohibition against loss carrybacks.[9] In hearings before the Senate Committee on Finance, representatives of the tax bar, in arguing for an exception for F reorganizations to the loss carryback prohibition, acknowledged that, as a general rule, a loss carryback prohibition would be justified where two or more corporations were involved because of the problem in determining to which of several component corporations the loss of the surviving corporation was attributable. Hearings on H.R. 8300 Before the Senate Comm. on Finance, 83d Cong., 2d Sess. 405 (1954) (supplemental statement of A.B.A., Section of Taxation). See Hearings, *supra* at 1543 (report of New York State Bar Association).

In proposing the exception for F reorganizations,[10] the tax bar premised its arguments on the assumption that, because an F reorganization (as defined at the time) only involved one corporation and therefore one tax history, the allowance of a carryback of post-merger losses against pre-merger profits would not present any problem of tax accountability (because

---

[9]No justification for the loss carryback prohibition is given in the committee report accompanying the House bill, H.R. 8300. See H. Rept. 1337, 83d Cong., 2d Sess. 41, A135 (1954). However, we note that, prior to the enactment of the 1954 Code, proposals developed by the various tax groups that studied the question of attribute carryover, rejected any carryback of post-reorganization net operating losses to pre-reorganization years, citing "technical and procedural difficulties" as justifying an absolute prohibition. A.B.A. Section of Taxation Comm. Report 41–44 (1950); A.L.I. Fed. Inc. Tax Statute 331–332 (Feb. 1954).

[10]The American Bar Association also proposed a second exception (which, if it had been adopted, might have applied here) to the carryback prohibition for the liquidation of a wholly owned subsidiary. This exception was not adopted by Congress; however, one commentator has suggested that this exception has effectively been adopted by the courts in the *Stauffer* line of cases. McManus, "Judicial Law-Making: The Liquidation of a Corporation Treated as an F Reorganization," 2 J. Corp. Tax. 273 (1975). The A.B.A. justified this second proposed exception on the basis of loss-tracing by stating:

"Another instance is that of the wholly owned subsidiary which is liquidated into its parent, which parent suffers a net operating loss in the following year. Unless amended, the law would permit the parent to carry this loss back only against its own income for the preceding year, *even though the assets of the subsidiary caused the entire loss in the subsequent year.* [Hearings on H.R. 8300 Before the Senate Comm. on Finance, 83d Cong., 2d Sess. 405 (1954). Emphasis supplied.]"

the same business that generated the loss would also have generated the income). Statement of American Bar Association, *supra*; Statement of New York State Bar Association, *supra.*

Further, the view that a carryback is appropriate where only one corporate tax history is involved is implicit in the examples given in the Senate committee report accompanying the revised 1954 bill:

For example, assume corporations X and Y transfer on December 31, 1954, all their property to Z in a transaction described in subparagraph (A) of section 368(a)(1). If Z has a net operating loss in 1955, such loss cannot be carried back to a taxable year of X or Y. Or, assume corporation X merges into corporation Y on December 31, 1954, in a statutory merger with Y's charter continuing after the merger. If Y has a net operating loss in 1955, such loss cannot be carried back to a taxable year of X but shall be a carryback to a taxable year of Y. *If, however, corporation X, in a reorganization described in subparagraph (F) of section 368(a)(1), merely changes its identity, form, or place of organization, the resulting corporation is entitled to carry back its net operating loss to a taxable year of X prior to the reorganization.* [S. Rept. 1622, 83d Cong., 2d Sess. 276 (1954). Emphasis supplied.]

Secondly, the loss-tracing requirement is supported by the same case law that supports petitioner's claim that the merger of Supermarkets into petitioner qualifies as an F reorganization. Petitioner argues that the loss-tracing requirement endorsed by the Ninth Circuit in *Estate of Stauffer v. Commissioner*, 403 F.2d 611 (9th Cir. 1968), revg. 48 T.C. 277 (1967), and by the Fifth Circuit in *Home Construction Corp. of America v. United States*, 439 F.2d 1165 (5th Cir. 1971), affg. 311 F. Supp. 830 (S.D. Ala. 1969), is mere dicta. We disagree.

In *Estate of Stauffer v. Commissioner, supra,* the question presented was whether a merger of three operating companies into a newly formed corporation was an F reorganization and therefore qualified under the exception to section 381(b)(3). After the merger, the new corporation, Stauffer New Mexico, sustained a net operating loss of $3,366,052, of which $2,184,689 was attributable to the business previously conducted by Stauffer California, one of the merged corporations.[11] Stauffer New Mexico claimed a carryback of the post-merger loss to a pre-merger taxable year of Stauffer California.

[11]See 48 T.C. at 285–286.

This Court upheld the Commissioner's disallowance of the carryback on the ground that the multicorporate merger did not qualify as an F reorganization. 48 T.C. 277, *supra*. The Court of Appeals for the Ninth Circuit reversed and held that the transaction satisfied the definition of an F reorganization, and therefore fell within the exception to section 381(b)(3). The Court then addressed the subsidiary issue of the amount of loss available as a carryback to the pre-merger taxable year of Stauffer California. 403 F.2d at 621. The Court held that only "that portion of the losses of Stauffer New Mexico attributable to the operations of Stauffer California * * * may be carried back to a pre-merger taxable year of Stauffer California." 403 F.2d at 621–622. In so holding, the Court noted that the post-merger losses of the pre-merger corporations other than Stauffer California could not be used to offset Stauffer California's pre-merger income, because a carryback in such a case "would accord to the transferee a benefit which would not have been available prior to the merger." 403 F.2d at 622.

In *Home Construction Corp. of America v. United States, supra*, the Court of Appeals for the Fifth Circuit, after holding that a merger of 123 separate corporations into one corporation constituted an F reorganization, turned to the question of "the method of determining what carry-back rights obtain." Reasoning that "The touchstone for correct calculation of loss carry-backs is that an after-merger taxpayer may not obtain any more favorable tax treatment than it would have received had the loss occurred under the business's pre-merger form," the Fifth Circuit held that "only such portion of the overall loss as can be shown to be attributable to each respective separate division within the new structure may be carried back, and then only be offset against gains of such division's pre-merger counterpart." 439 F.2d at 1172.

Petitioner argues that the only authority for the loss-tracing rule articulated by the *Stauffer* and *Home Construction* courts is the Supreme Court's decision in *Libson Shops, Inc. v. Koehler*, 353 U.S. 382 (1957), a case that petitioner claims has no continuing vitality under the 1954 Code. We disagree.

In the first place, as stated above, we believe that the legislative history of section 381 justifies the loss-tracing requirement. It is to be noted in this regard that the present controversy involves a net operating loss carryback rather

than a carryover. Congress accorded different treatment to carryovers than to carrybacks. In general, the carryover of net operating losses in connection with certain tax-free liquidations and reorganizations is permitted provided that certain conditions set out in section 382 have been satisfied. A net operating loss carryback, on the other hand, is generally proscribed because of the loss-tracing problem posed thereby. The exception posed for F reorganizations was intended to cover the narrow class of cases where, due to the fact that the merger in question involved a mere formalistic change in corporate structure, there was in substance but one corporation's tax history involved.

Secondly, we are not prepared to accept petitioner's argument that *Libson Shops* has no application under the 1954 Code. As this Court has pointed out previously, it may well be that sections 381 and 382 in effect override the rule of *Libson Shops* in the net operating loss carryover area. *Clarksdale Rubber Co. v. Commissioner*, 45 T.C. 234 (1965); *Beckett v. Commissioner*, 41 T.C. 386 (1963), revd. sub nom. *Maxwell Hardware Co. v. Commissioner*, 343 F.2d 713 (9th Cir. 1965). But here we are concerned with a net operating loss carryback. Given that the F reorganization exception to section 381(b)(3) is left undefined by the statute, we believe that the broad principles set forth in *Libson Shops* are relevant in determining the applicability of the exception to the factual situation before us. *See Euclid-Tennessee, Inc. v. Commissioner*, 352 F.2d 991, 994 (6th Cir. 1964), affg. 41 T.C. 752 (1964).

The principle articulated by the Supreme Court in *Libson Shops* that an interpretation should be avoided that would afford a "windfall" to a taxpayer which happens to have merged with other corporations is applicable here. Petitioner here has attempted to average the losses of its other businesses, incurred in the reorganization year, against the pre-reorganization and previously separately taxed income of the New Orleans business. It is clear that had no merger occurred, petitioner could not have carried back the 1974 loss to Supermarkets' 1972 separate return tax year under the loss-tracing rules of section 1.1502–79(a) of the consolidated return regulations. Thus, the allowance of the disputed loss carryback would accord petitioner a benefit which would not have been available prior to the merger. We cannot allow petitioner such

a benefit, where doing so would afford petitioner the "windfall" proscribed in *Libson Shops*. Accordingly,

*Decision will be entered for the respondent.*